Opinion
 

 MORRISON, J.
 

 This case involves fraud by a land developer (Dale Williams) and his operating companies (Leasco) upon a contractor, Hossam Buzgheia. A jury awarded a substantial fraud verdict including punitive damages, and the court awarded attorney’s fees and prejudgment interest, all totaling over $3 million. The jury rendered duplicative awards for breach of written and oral contracts and interference with prospective advantage. In an earlier proceeding, we held Williams posted adequate appellate sureties.
 
 (Buzgheia
 
 v.
 
 Leasco Sierra Grove
 
 (1994) 30 Cal.App.4th 766 [36 Cal.Rptr.2d 144].) We now reverse the judgment.
 

 In part I, we find the court incorrectly instructed on the burden of proof regarding Buzgheia’s contractor’s license. In part II, we find the error prejudicial. In an unpublished portion of this opinion, we address some issues likely to recur on retrial.
 

 First, we set out a sketch of the facts, viewed in favor of the verdict.
 
 (Bancroft-Whitney Co.
 
 v.
 
 McHugh
 
 (1913) 166 Cal. 140, 142 [134 P. 1157]; see
 
 People
 
 v.
 
 Johnson
 
 (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The introduction to Buzgheia’s brief states the gist of the case accurately and concisely: “ ‘Devious,’ confessed appellants’ construction manager, describing appellants’ dealings with [Buzgheia.] . . . ["JQ Appellants convinced Buzgheia, a licensed contractor, to do the framing on one of their construction projects at money-losing prices. In return, they promised to give him contracts on two other projects and make up for his losses. They lied. They also knew that the framing would require substantially more work than the plans revealed, but they concealed this from Buzgheia. Then, after he began work, appellants [approved] change orders and extra work, with repeated promises of additional compensation. Again, they lied.”
 

 
 *379
 
 More particularly, Leasco planned to build three apartment complexes, the Fairfield, Rocklin and‘Modesto projects. Leasco fired the wood framing contractor at Fairfield. Because Leasco could not exceed a bank budget, it rejected Buzgheia’s original bid of $874,000 to finish the framing on Fairfield. To stay within budget Williams told his construction manager: “Beat up on the subs, and get the prices down. Bring them in line. Offer them more work.” Buzgheia agreed to lower his price on Fairfield after Leasco offered him additional work at Rocklin and Modesto at inflated prices: He submitted a reduced bid on Fairfield and raised the bid on Rocklin by some $96,000; he also submitted a per-square-foot bid for Modesto which represented inflated profit of $80,000. This is the “package deal.” A separate $20,000 “deal” was made for the Fairfield clubhouse. Buzgheia began work about March 1, 1990, without written contracts. In mid-June, he signed contracts for Fairfield and Rocklin, but not Modesto.
 

 Due to factors outside Buzgheia’s control, including defective plans, extra work was required on both Fairfield and Rocklin. Leasco knew some extra work would be required on Fairfield but withheld this information from Buzgheia. Leasco’s construction manager and other agents approved change orders at both Fairfield and Rocklin, or directed Buzgheia to do extra work, though Williams stated he would never pay for any changes. The construction manager testified “We were being devious,” in that Williams told him to tell Buzgheia the work was authorized, but Williams was not going to pay for it.
 

 In May and June, Buzgheia was not being paid properly and it was hard to keep working. At the end of June, Williams told Buzgheia he could not pay for extras, to walk away from Fairfield and concentrate on Rocklin; Buzgheia agreed because he had no choice, but insisted Williams not hassle him at Rocklin and produce a contract for Modesto: Williams agreed, but payment was still slow. On July 27, 1990, Williams confronted Buzgheia with a tax deficiency letter and a subcontractor lien, each related to Buzgheia’s work. He offered to “loan” Buzgheia $10,000 if he would forget about other money due. Buzgheia walked away. Buzgheia had completed most of the framing at Fairfield and Rocklin and his work was good.
 

 In a related proceeding, Leasco filed a
 
 coram vobis
 
 petition in this court, which included a declaration under penalty of perjury by the construction manager, claiming he perjured himself at trial. We denied the petition
 
 (Busgheia
 
 v.
 
 Leasco Sierra Grove
 
 (Aug. 27, 1996) C024350 [nonpub. opn.].) and the California Supreme Court denied review
 
 (Busgheia
 
 v.
 
 Leasco Sierra Grove
 
 (Oct. 30, 1996) S056028). Obviously this witness committed perjury, either at trial or in his declaration in the
 
 coram vobis
 
 proceeding, a fact
 
 *380
 
 which may play a role in retrial, or settlement. It does not appear any criminal prosecution has been initiated.
 

 Discussion
 

 I
 

 The trial court gave the wrong party the burden of proof regarding
 

 Buzgheia’s license.
 

 A.
 
 Introduction.
 

 1.
 
 The issue.
 

 A critical issue was whether Buzgheia acted under a valid license: Unless he was “a duly licensed contractor” he could not sue Leasco. (Bus. & Prof. Code, § 7031, subd. (a); further section references are to this code.)
 

 In
 
 Hydrotech Systems, Ltd.
 
 v.
 
 Oasis Waterpark
 
 (1991) 52 Cal.3d 988 [277 Cal.Rptr. 517, 803 P.2d 370] (Hydrotech), the California Supreme Court explained (at p. 995): “The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. . . . The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [*$] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay. [fl] Because of the strength and clarity of this policy, it is well settled that section 7031 applies despite injustice to the unlicensed contractor. ‘Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business
 
 outweighs any harshness between the parties,
 
 and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state. . . .’ ” (Original italics, citations omitted.)
 

 Buzgheia held no license personally during his work on the Leasco jobs. He did business as Tripoli Construction Company (Tripoli), which held a license by virtue of its employment of a “responsible managing employee” (RME), Charles Laird. (§ 7068.) Leasco took the position that Laird was not a “bona fide” employee, did virtually no work on the Leasco projects and
 
 *381
 
 therefore Tripoli (and hence, Buzgheia) was not “duly licensed.” Leasco concedes the license was valid in that it was neither forged, expired, nor held by some other entity.
 

 A responsible managing employee “is a bona fide employee of the applicant and is actively engaged in the classification of work for which that responsible managing employee is the qualifying person in behalf of the applicant.” (§7068, subd. (d).) “The person qualifying on behalf of an individual. . . shall be responsible for exercising that direct supervision and control of his or her employer’s or principal’s construction operations as is necessary to secure full compliance with the provisions of this chapter and the rules and regulations of the board relating to the construction operations.” (§ 7068.1.)
 

 Under regulations promulgated by the Contractors’ State License Board (the Board), a “bona fide” employee is “an employee who is permanently employed by the applicant and is actively engaged in the operation of the applicant’s contracting business for at least 32 hours or 80% of the total hours per week such business is in operation, whichever is less.” (Cal. Code Regs., tit. 16, § 823, subd. (a).) “ ‘[D]irect supervision and control’ includes any one or any combination of the following activities: supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites.”
 
 (Id.
 
 at subd. (b).) Personal presence is not necessary. (G.
 
 E. Hetrick & Associates, Inc.
 
 v.
 
 Summit Construction & Maintenance Co.
 
 (1992) 11 Cal.App.4th 318, 328-329 [13 Cal.Rptr.2d 803] (G.
 
 E. Hetrick); Swickheimer
 
 v.
 
 King
 
 (1971) 22 Cal.App.3d 220, 224 [99 Cal.Rptr. 176].)
 

 Section 7068.2 provides in part that upon failure to replace the RME or notify the registrar of disassociation of the RME within 90 days, “the license shall be automatically suspended or the classification removed[.]”
 

 2.
 
 The pleadings.
 

 In his third amended complaint Buzgheia alleged he “was a general building contractor
 
 with a qualifying responsible managing employee
 
 (‘RME’), and was duly licensed to do business as such[.]” (Italics added.) Leasco denied this allegation. Leasco also pleaded as an affirmative defense that Buzgheia had no proper RME.
 

 3.
 
 The course of trial.
 

 The RME issue was primarily presented via the testimony of Laird and of Buzgheia. Depending on what evidence the jury believed, it could find either
 
 *382
 
 that Laird was a bona fide RME or that Laird was a sham RME—Leasco’s version established Laird effectively lent his license to Buzgheia. Leasco’s claim that no substantial evidence supports the finding Laird was a bona fide RME amounts to an invitation to reweigh the evidence, which we decline.
 

 Laird testified he was with “Sam” (Buzgheia) from the beginning of the job at Fairfield until two weeks before Buzgheia left; he did “layout,” and provided telephone and in-home consultations. He could only document $2,072 in wages from Buzgheia; he claimed he was paid in cash to avoid taxes, apparently to facilitate his accommodation of his wife’s illness. Laird’s 1990 tax return reflected cash income of $23,595, treated as income from Laird’s separate contracting business; the return indicated wages of but $2,072 from Buzgheia. Laird explained he treated Buzgheia’s payments (the amount of which he could not recall) as income to his separate business, that his tax return was false although he had signed it under penalty of perjury. Over half of the $2,072 reported wages was reported before March 23, 1990 (recall that work started about March 1), the rest before June 30, 1990, none between June 30 and September 30, 1990. Buzgheia made no records of the payments or Laird’s hours. Laird worked for another company at the same time and could not recall how many hours he worked for Buzgheia. His tax return reflected over $13,000 in wages from the other company. In deposition he said he worked four or five weeks at Fairfield or longer, he could not recall.
 

 In cross-examination Laird said he did not do the layout or any supervision at Rocklin, that he was only there twice and that was before the job started. He also said he did no supervision at Fairfield, but on redirect claimed he did “quality control” although “I don’t want to get involved in telling laborers what to do.” Buzgheia testified Laird helped do layout at Rocklin and helped select employees. He consulted with Laird at home and over the telephone. Laird would do things like framing, stairs and “stacking” of rooms. In deposition Buzgheia had testified Laird worked on but one of the two jobs. Another witness saw Laird on the job “off and on” for over three months.
 

 Apart from the testimony of Laird and Buzgheia, another category of evidence was admitted on the question of Laird’s bona fides. Before trial began the Board determined not to proceed against Buzgheia’s license. The trial court ruled that the matter would go to the jury. At the beginning of jury selection Buzgheia presented to the court a Board letter naming deputy registrar Stephen Takimoto as the individual who had investigated the complaint. Buzgheia now wanted to call Takimoto as a witness. After argument the court ruled that both Takimoto and his supervisor, Victoria
 
 *383
 
 Fallon, could testify because that “under 352 those subjects do have some relevance, as it relates to the RME issue.”
 

 The court gave an admonition that the testimony was relevant to and only to the lack of discipline against the license and the jury had “under your jurisdiction the right to determine, as the trier of fact, whether there is appropriate licensing qualifications for purposes of seeking payment under the contract. ['JQ So you may accept the evidence of the [Board] for the limited purpose of their jurisdiction and disciplinary proceeding, and not for purpose of your determining whether the Plaintiff is entitled to payment under the contract.”
 

 The trial court, over renewed objection, permitted Takimoto to testify that after reviewing the facts, he did not find clear and convincing evidence to support discipline based on violation of the RME laws. Takimoto also gave his interpretation of the RME regulations in response to hypotheticals. Takimoto testified “no citation was issued,” “there was a lack of clear and convincing evidence that . . . Tripoli Construction had not complied with the sections of law that I was looking at pertaining to RME.” When asked if Laird “was a bona fide employee,” Takimoto answered
 
 “not to the letter of the law.
 
 There was substantial compliance. [*]0 And there wasn’t sufficient reason to take any further action or disciplinary action against the license holder.” (Italics added.) To seek discipline “we need clear and convincing evidence.” His supervisor, Fallon, testified,“I wouldn’t know if there was a suspension or something that the Board had done. [']□ But as far as the matter we investigated, we did not [take action].”
 

 4.
 
 The instruction and verdict.
 

 The trial court, over Leasco’s objection instructed the jury as follows: “Plaintiff may establish licensure . . . through a certified copy of the license history of Tripoli. The certificate of licensure establishes a rebuttable presumption that Tripoli was duly licensed at all times during performance of the contracts with the defendants. The effect of such presumption is to impose upon the defendants the burden of proof as to the nonexistence of the presumed fact.” The jury found, by answer special interrogatories, that Buzgheia was duly licensed.
 

 B.
 
 Buzgheia had the burden to prove licensure.
 

 Buzgheia acknowledges he had the burden of proof to establish licensure. We agree, but it is necessary to set out the statutory scheme to explain why. Despite Leasco’s statement at oral argument that “we all agree” which
 

 
 *384
 
 statute applies, the parties quote and rely on different versions of section 7031 in their briefs. For now, we will focus on the statute applicable at the time of trial in 1993:
 

 “(a) [N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action ... for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging that he or she was a duly licensed contractor ....
 

 “(b)................................
 

 “(c) If licensure or proper licensure is controverted, then proof of licensure pursuant to this section shall be made by production of a verified certificate of licensure from the Contractors’ State License Board which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action.” (Former § 7031, as amended by Stats. 1992, ch. 229, § 1, p. 1019.)
 

 “Classification” is a term of art which refers to various specialty licenses. (See § 7055 et seq.;
 
 Currie
 
 v.
 
 Stolowitz
 
 (1959) 169 Cal.App.2d 810 [338 P.2d 208] [heating contractor could not recover for plumbing]; Gibbs & Hunt, Cal. Construction Law (15th ed. 1992) Licensing, § 1.2, pp. 2-4.)
 

 From the adoption of section 7031 through the 1991 amendment it stated the contractor could not recover without “alleging and proving” licensure. (Stats. 1939, ch. 37, § 1, p. 384; Stats. 1991, ch. 632, § 1, pp. 2936-2937.) However, in 1992 it was amended so that section 7031, subdivision (a) merely required that the licensee “alleg[e]” licensure, and subdivision (c) provided “If licensure or proper licensure is controverted, then proof of licensure pursuant to this section shall be made by production of a verified certificate.” (Stats. 1992, ch. 229, § 1, p. 1019.) We further note that the statute was amended effective January 1, 1994—after trial—to add the following to subdivision (c): “Nothing herein shall require any person or entity controverting licensure or proper licensure to produce a verified certificate.
 
 When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee."
 
 (§ 7031, subd. (c), as amended by Stats. 1993, ch. 797, § 1, italics added.)
 

 Nowhere in the 1992 amendment is there an express delegation of burden of proof to the contractor, but the omission is not material: Such requirement is inherent in the statutory scheme. (See
 
 Fillmore
 
 v.
 
 Irvine
 
 (1983) 146
 
 *385
 
 Cal.App.3d 649, 660 [194 Cal.Rptr. 319].) The omission appears to be a drafting error, quickly cured by the amendment effective in 1994, after this trial. Moreover, section 143, subdivision (a), requires each licensee governed by the code (which includes contractors) to “alleg[e] and prov[e] that he or she was duly licensed[.]” (Stats. 1990, ch. 1207, § 1.5, p. 5045; see Acret, Cal. Construction Law Manual (4th ed. 1995 supp.) Contractors’ License Law, § 4.05, pp. 52-53.)
 

 C.
 
 Buzgheia’s burden encompassed the burden to prove a bona fide RME when such was controverted.
 

 1.
 
 Leasco may attack Buzgheia’s license.
 

 a.
 
 Leasco may contest the RME’s bona fides.
 

 Although there is a statutory civil remedy to
 
 suspend or revoke
 
 a contractor’s license (§ 7106; see
 
 Judson Pacific-Murphy Corp.
 
 v.
 
 Durkee
 
 (1956) 144 Cal.App.2d 377, 385-386 [301 P.2d 97]
 
 (Judson)),
 
 it is not immediately clear a party should be able to go behind the fact of licensure to defeat a contractor’s claim based on defective
 
 exercise
 
 of the license.
 
 G. E. Hetrick, supra,
 
 11 Cal.App.4th 318, assumes such an attack is possible and Buzgheia, in his respondent’s brief, states “This is a question of fact that had to go to the jury,” citing
 
 G. E. Hetrick.
 

 We had doubts about this question and solicited supplemental briefing from the parties and from the Registrar of Contractors, as an amicus curiae. The registrar and Leasco contend an attack on the bona fides of an RME is permissible under the statutes. The registrar emphasizes that “Evasion and deception in obtaining and maintaining a contractor’s license in violation of the licensing law should not be sanctioned.” We agree. It
 
 is
 
 possible for a party in a civil action to attack a contractor’s license by going behind the face of the license and proving that a required RME is a “sham.”
 

 In addition to the
 
 G. E. Hetrick, supra,
 
 11 Cal.App.4th 318, there is abundant, long-standing, case law supporting such an attack.
 
 (Rushing
 
 v.
 
 Powell
 
 (1976) 61 Cal.App.3d 597, 605-607 [130 Cal.Rptr. 110];
 
 Weeks
 
 v.
 
 Merritt Bldg. & Constr. Co.
 
 (1974) 39 Cal.App.3d 520, 524 [114 Cal.Rptr. 209] [“failure to replace the responsible managing employee bars recovery for work performed after his departure”];
 
 Famous Builders, Inc.
 
 v.
 
 Bolin
 
 (1968) 264 Cal.App.2d 37, 40-41 [70 Cal.Rptr. 17]; see
 
 Shields
 
 v.
 
 Shoaff
 
 (1953) 116 Cal.App.2d 306, 309 [253 P.2d 1002].)
 

 As
 
 Hydrotech
 
 and other cases make clear, the purpose of the law is to protect consumers of construction services, such as Leasco. (E.g.,
 
 Bowline
 
 v.
 
 *386
 

 Gries
 
 (1950) 97 Cal.App.2d 741, 743 [218 P.2d 806] [“thousands of people had been bilked”];
 
 West Coast etc. Co.
 
 v.
 
 Contractors’ etc. Bd.
 
 (1945) 72 Cal.App.2d 287, 301 [164 P.2d 811] [“law is intended primarily to keep the contracting business clean and wholesome, to the end that it may merit the respect and confidence of the public in general and in particular those who have recourse to contractors in the construction or improvement of their properties”].) The “lending” of licenses, which exposes consumers to incompetent workmanship, has long been decried. (See Acret, Cal. Construction Law Manual,
 
 supra,
 
 Necessity of License, § 4.01, p. 144.) A good example of the problem is provided by the case of
 
 Rushing
 
 v.
 
 Powell, supra,
 
 61 Cal.App.3d 597. Rushing held a concrete specialty license; Anderson held a swimming pool specialty license. Rushing paid Anderson to allow Rushing’s company to qualify for a swimming pool license, but Anderson did no work. (Pp. 601-602.) This “permitted the plaintiff in substance to engage in a specialty in which he had not demonstrated qualification by taking and passing the appropriate examination and for which he had not been licensed as an individual, in violation of the stated purpose and of the spirit of the Contractors License Law. [Citation.]” (P. 605.) “From [the qualification] provisions it is readily inferable that the Legislature intended that the persons so qualified on behalf of the business entity be active participants in the business.” (P. 606.) “In the case at bench Anderson did not participate in the business at all, thus violating the statute and rendering the purported [specialty] license a nullity.”
 
 (Ibid.)
 
 “As was said in
 
 [Weeks
 
 v.
 
 Merritt Bldg. & Constr. Co., supra,
 
 39 Cal.App.3d at page 525], ‘Clearly, in the situation at hand, respondents did not receive “the full protection which the statute contemplates,” which is work performed by or under the supervision of a licensed contractor.’ ” (P. 607.) The registrar’s interpretation of the licensing law, which is entitled to respect
 
 (Bowline
 
 v.
 
 Gries, supra,
 
 97 Cal.App.2d at p. 745), is in accord with
 
 Rushing,
 
 namely, use of a license without RME compliance is like use of a license outside a given specialty classification, and the need to protect consumers requires that a licensee may be barred from suit upon proof of use of a “sham” RME.
 

 It was appropriate for Leasco to attack the bona fides of Buzgheia’s purported “responsible managing employee.” Leasco, as a consumer party to a construction contract, was entitled to demand the protections of the licensing scheme in this civil proceeding. We accept the implicit, longstanding and unbroken understanding of cases which permit a party to a contract to challenge the bona fides of a contractor’s RME in a civil suit. If the RME was a sham, the contractor is barred from recovery because he or she is, in effect, acting outside the license, just like a specialty contractor who labors at a task for which he or she has no expertise nor license.
 
 (Rushing
 
 v.
 
 Powell, supra,
 
 61 Cal.App.3d at p. 606 [“Anderson did not
 
 *387
 
 participate in the business at all, thus violating the statute and rendering the purported C-53 license a nullity”].) In such case the contractor has evaded the skill and knowledge requirements, leaving the consumer unprotected. That is the evil targeted by section 7031, which is designed to be used as a shield by consumers of contracting services. Further, upon disassociation of the RME, the license is automatically suspended (§ 7068.2) therefore the contractor is no longer “duly licensed” and may not bring suit. (§7031, subd. (a).)
 

 Mention was made at oral argument of the “substantial compliance doctrine.” To the extent the substantial compliance doctrine is relevant to this case it bolsters our conclusion herein, because it shows that the Legislature knows how to mitigate the harshness of the bar to sue, but did so in such a way which does not aid Buzgheia. The Legislature first eliminated the doctrine (Stats. 1989, ch. 369, § 1, p. 1509), then narrowed it, generally speaking, to those cases involving contractors who acted reasonably. (§ 7031, subd. (d); Stats. 1991, ch. 632, § 1, pp. 2936-2937; Stats. 1994, ch. 550, § 1.) A recent case states that because the contractor’s RME “was no longer employed . . . when it commenced work .... [Contractor] did not have a contractor’s license of any kind at the time it was performing the work sued upon in this action[.] ['][] Since [Contractor] did not have a license which authorized its work . . . section 7031 precluded [it] from recovering against the defendants unless it proved substantial compliance with the licensing requirements.”
 
 (Construction Financial
 
 v.
 
 Perlite Plastering Co.
 
 (1997) 53 Cal.App.4th 170, 174-175 [61 Cal.Rptr.2d 574]; see
 
 id.
 
 at pp. 177-180.) This accords with our view: Once the RME is not performing his function, it is as if the contractor has no license at all.
 

 Buzgheia notes that a contractor has 90 days in which to replace the RME before the license is “automatically” suspended. (§ 7068.2.) He then states, “even if this court could reconstrue the evidence and surmise that Mr. Laird completely left Tripoli’s employment in June 1990, that would not have affected the validity of Tripoli’s license, and its right to be paid for the work, from that time until defendants threw Mr. Buzgheia off the Rocklin job near the end of July, far less than 90 days later.” This ignores the fact that work began in March and there was evidence from which a jury could find Laird was
 
 never
 
 a bona fide RME on this job; that the 90 days ran well before the end of July.
 

 b.
 
 No administrative finding bars Leasco’s attack.
 

 Buzgheia contested Leasco’s ability to attack the license by
 
 in limine
 
 motion, pointing to the fact that the Board had decided not to proceed against Buzgheia’s license. Buzgheia claims the failure to “appeal” the
 
 *388
 
 Board’s decision means Leasco is “barred from asserting that the Board erred in not taking away the license.”
 

 The Board’s determination not to proceed does not bar Leasco from a defense that is otherwise available. To the extent the
 
 Board
 
 did anything it declined to discipline the license for lack of “clear and convincing” evidence of noncompliance with the RME regulations. The failure of the Board to seek discipline does not represent an administrative finding that Laird was a bona fide RME. In reality, the
 
 Board
 
 made no findings at all, its investigative arm simply declined to pursue the case.
 

 The cases cited by Buzgheia are of no aid to him. In one portion of
 
 Judson, supra,
 
 144 Cal.App.2d 377, the registrar “on the advice of the attorney general, has found no violation, and so, of course, found no suspension of the license.” (P. 387.)
 
 Judson
 
 observed that the issue should not be relitigated: “[W]e now know that the board charged with the primary duty of making such an investigation, and which has at least concurrent jurisdiction with the courts, in a proceeding started before the issue was raised in a court, has decided the issue and found no violation.”
 
 (Ibid.)
 
 This portion of
 
 Judson
 
 is an alternate holding and contains no citation to authority. Assuming it is correct, it does not apply here because the Board did not find that a violation had not occurred.
 

 Another portion of
 
 Judson, supra, 144
 
 Cal.App.2d 377, at pages 384-385, rejected the claim that disassociation of an RME results in automatic suspension of the license because the statute then provided the “license shall be
 
 ipso facto
 
 suspended” which requires action by the Board or registrar. (Former § 7068, subd. (b); Stats. 1941, ch. 971, § 11, pp. 2604-2605, italics added.) But the relevant statute, passed three years after
 
 Judson
 
 was decided, now provides for such
 
 automatic
 
 suspension. (§ 7068.2.) This portion of
 
 Judson
 
 was abrogated. (Stats. 1959, ch. 407, § 3, p. 2342; cf. Stats. 1957, ch. 720, § 1, p. 1927.)
 

 Finally, we observe that the entity attacking the license in
 
 Judson
 
 was not a party to a contract, but was a losing bidder trying to knock off the winning bidder on a project by demonstrating impropriety in the way in which its license was held. That fact, deemed significant in
 
 Judson
 
 (see
 
 Judson, supra, 144
 
 Cal.App.2d at pp. 385-386), is absent here.
 

 Fechi
 
 v.
 
 Trojan Construction Co.
 
 (1960) 185 Cal.App.2d 121, 124-125 [8 Cal.Rptr. 138], cited by Buzgheia, held there was no RME violation, then, in an alternate holding, reiterates
 
 Judson
 
 without analysis. It adds nothing to the argument.
 

 
 *389
 
 c.
 
 Conclusion.
 

 Leasco properly sought to show that Buzgheia was acting without an RME and therefore should not be permitted to bring suit. This conclusion requires us to consider whether the instructions governing the mode of such an attack properly conveyed to the jury the correct burden of proof, when the issue of due licensure is controverted.
 

 2.
 
 Once Leasco controverted his bona fides, Buzgheia had to prove the RME was “bona fide.'"
 

 The versions of section 7031, subdivision (c) in effect in 1990 and in 1993 state: Proof of licensure “shall be made by production of a verified certificate . . . which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action.” (Stats. 1989, ch. 368, § 1, p. 1509; Stats. 1992, ch. 229, § 1, p. 1019.)
 

 Buzgheia interprets this language to mean he had no burden other than to produce the license certificate. Leasco interprets it to mean production of the certificate is necessary, but insufficient if the point is controverted: “To permit a certificate from the [Board] to shift the burden of proof to the defendant would have a deleterious effect upon the public policy of deterring unlicensed contracting.” Leasco’s interpretation accords with the licensing statutes, as well as the statutes regarding presumptions and burdens of proof, and it advances the policy immanent in the licensing scheme.
 

 In the trial court Buzgheia relied in part on section 162, which provides that Board records “shall be admitted in any court as prima facie evidence of the facts therein recited.” (See also §§ 23, 101, subd. (j).) We agree production of the license established a prima facie case, either by virtue of section 162, or by section 7031, subdivision (c). But that does not end the inquiry.
 

 “Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.” (Evid. Code, § 500.) Due licensure being essential to Buzgheia’s claim, the burden of proof rested with him. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 133, p. 117.)
 

 There is no sound policy reason for shifting the burden of proof to Leasco. (See
 
 Mathis
 
 v.
 
 Morrissey
 
 (1992) 11 Cal.App.4th 332, 346 & fn. 8 [13 Cal.Rptr.2d 819].) “In determining whether the normal allocation of
 
 *390
 
 the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.” (Cal. Law Revision Com. com., 29B pt. 2 West’s Ann. Evid. Code (1995 ed.) foll. § 500, p. 554;
 
 id.,
 
 Deering’s Ann. Evid. Code (1986 ed.) foll. § 500, p. 215; see 1 Witkin, Cal. Evidence,
 
 supra,
 
 Burden of Proof and Presumptions, §§ 136-138, pp. 119-121.) The contractor will (or should) have knowledge of how he has utilized the RME. The contractor will (or should) have greater access to evidence, namely his own records, including payroll records, timesheets, the names of other employees who can testify to the activities of the RME and so forth. The “most desirable result in terms of public policy in the absence of proof’ that a contractor complied with the licensing laws, including the RME provisions thereof, is that the contractor who evades the law should be barred from court.
 
 (Fillmore
 
 v.
 
 Irvine, supra,
 
 146 Cal.App.3d at pp. 660-661; see
 
 Hydrotech, supra,
 
 52 Cal.3d at p. 995 [policy is “to discourage persons who have failed to comply with the licensing law”].) These factors militate against a judicially created shift in the burden of proof.
 

 Nor did Buzgheia’s satisfaction of his “prima facie” evidence shift the burden to Leasco. “A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption.” (Evid. Code, § 602.) “A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence.”
 
 (Id.
 
 at § 600, subd. (a).) A presumption “established to implement no public policy other than to facilitate the determination of the particular action” shifts the burden of producing evidence.
 
 (Id.
 
 at §§ 603, 604.) A presumption “established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of marriage, the stability of titles to property, or the security of those who entrust themselves or their property to the administration of others” shifts the burden of proof.
 
 (Id.
 
 at §§ 605, 606.)
 

 The presumption facilitating proof of the Board’s records does not advance any public policy of the magnitude just listed. It is true, as Buzgheia points out, that the public policy against unlicensed contracting is strong. But that fact cuts against Buzgheia. The statutory provisions regarding proof of the license itself merely facilitate the determination of the action in question by making proof of issuance of a license and the type of license simpler. Those provisions do not implicate the substantive policy against
 
 *391
 
 unlawful contracting. Section 7106 provides that production of a certificate of licensure from the Board constitutes proof of licensure. Taking into account the history of section 7106, the public policy advanced by the section, and the cases interpreting the section, we interpret the phrase, “proof of licensure . . . shall be made by production of a verified certificate ...” to mean production of a verified certificate establishes a rebuttable presumption of licensure. If the Legislature wished to make the simple possession of a license the end of the matter, it could have made the presumption irrebuttable.
 

 To express this in another way, it is true the license requirement implicates the public policy to deter unlawful contracting. But
 
 the mode of proof of a license
 
 is not a matter implicating that public policy, it is a matter of procedural convenience. This view is reinforced by a leading treatise, which states: “Business and Professions Code § 7031 was amended effective January 1, 1993, to eliminate the automatic requirement that a contractor bringing or maintaining an action to collect compensation must prove that the contractor was properly licensed at the time of providing the contracting services. As amended, [§ 7031] merely requires the contractor to
 
 allege
 
 that he or she was duly licensed, and . . . requires [proof] only if licensure or proper licensure is controverted. This common sense and practical amendment is especially welcome because the board’s staff has fallen behind in processing license certificates.” (Acret, Attorneys Guide to Cal. Construction Contracts and Disputes (Cont.Ed.Bar 1995) Unlicensed Contractors’ Litigation, § 1.29, p. 15; see also 1 Witkin, Summary of Cal. Law (9th ed., 1995 supp.) Contracts, § 495, p. 117.)
 

 This view is also reflected in a snippet from the “legislative history” proffered by Buzgheia, of which we took judicial notice. For what such history is worth, it reflects that the problem was posed as follows: “While attorneys who represent contractors are aware they must plead licensure, many are not aware that a certificate from the board is necessary to prove it. [1 The sponsor thinks that production of the certificate of licensure should only be required if licensure is at issue in the case. That is, if the contractor swears under oath that he or she was licensed, and the defendant’s attorney has determined that the contractor was not, only then would the contractor be required to produce a copy of the certificate of licensure. . . . The board may take up to 6 months to issue the certificate. The sponsor states that cases involving licensure status are rare, and contractors are losing cases [e.g., by nonsuit] where they might otherwise prevail but for this technicality.” (Assem. Com. Consumer Protection, Gov. Efficiency and Economic Dev., Analysis of Assem. Bill No. 2413 (1991-1992 Reg. Sess.) May 6, 1992.)
 

 Because the manner of proof does no more than “facilitate the determination of the particular action” it merely shifts the burden of producing
 
 *392
 
 evidence. (Evid. Code, §§ 603, 604.) Upon production of “evidence . . . which would support a finding” of nonlicensure, the presumption of proper licensure disappeared and Buzgheia reassumed the burden of proof.
 
 {Id.
 
 at §§ 110, 604.) The trial court should not have instructed on the “shifting” of burdens upon Leasco’s satisfaction of its burden to produce some evidence contesting Laird’s bona tides. (See Cal. Law Revision Com. com., 29B pt. 2 West’s Ann. Evid. Code,
 
 supra,
 
 foil. § 604, p. 59;
 
 id.,
 
 Deering’s Ann. Evid. Code,
 
 supra,
 
 foil. § 604, p. 248 [“If a presumption affecting the burden of producing evidence is relied on, the judge must determine whether there is evidence sufficient to sustain a finding of the nonexistence of the presumed fact. If there is such evidence, the presumption disappears and the judge need say nothing about it in his instructions.”].)
 

 Buzgheia suggests that because Leasco pleaded improper licensure as an affirmative defense Leasco bore the burden of proof. But Leasco also denied the allegation of proper licensure and, as we have explained, encompassed within plaintiff’s duty to prove licensure is the duty, if the point is controverted, to prove proper use of the RME.
 

 In this connection Buzgheia relies on
 
 Alaska Salmon Co.
 
 v.
 
 Standard Box Co.
 
 (1910) 158 Cal. 567 [112 P. 454], where the defendant breacher denied the allegations of the complaint and also interposed an affirmative defense, namely, that the plaintiff had failed to pay its corporate license tax. (158 Cal. at p. 569.) A statute provided the corporate articles “ ‘must be received in all the courts of this state and in other places as
 
 prima facie
 
 evidence of the facts therein stated.’ ”
 
 (Id.
 
 at p. 570; see now Coip. Code, § 209.) The defendant urged plaintiff had to plead compliance with the license tax law. The court rejected the claim: “it was a matter of affirmative defense[.]” (158 Cal. at p. 570.) The court elaborated on this point. First, it relied on a former statute providing that evidence must be given in support of a negative allegation where such is part of the defense.
 
 (Id.
 
 at pp. 576-577.) Later the court pointed out the defense is not based merely on failure to pay the tax, but from administrative action declaring corporate forfeiture.
 
 (Id.
 
 at p. 578.)
 

 Unlike a contractor who must plead licensure, a corporation need not plead capacity to sue; incapacity is an affirmative defense. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 847, 1056, pp. 293, 471.) The negative allegations rule relied on in
 
 Alaska Salmon
 
 was abrogated by adoption of the Evidence Code. (See Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. Ill, Burden of Producing Evidence, Burden of Proof, and Presumptions (June 1964) 6 Cal. Law Revision Com. Rep. (1964) pp. 1001, 1122-1124 [criticizing rule].) Finally, as explained above, administrative action is not required herein because the statute provides for “automatic” suspension.
 
 Alaska Salmon
 
 avails Buzgheia naught.
 

 
 *393
 
 3.
 
 Conclusion.
 

 As the contractor seeking compensation, Buzgheia retained the burden of proving due licensure, which included the burden of proving compliance with the RME requirements. Neither possession of a facially valid license nor the failure of the Board to act against the license removed this burden from his shoulders. Because Leasco introduced evidence contesting the point, the presumption of due licensure was rebutted and the trial court should not have instructed the jury that Leasco had to prove the RME was a sham. No instruction on “shifting burdens” should have been given: The jury should simply have been informed that Buzgheia had the burden to prove due licensure, specifically, that his RME was bona fide. The trial court’s allocation of the burden of proof was erroneous.
 

 n
 

 The instructional error was prejudicial.
 

 The instruction shifting the burden of proof to Leasco should not have been given. Witkin states that the use of “Incorrect terminology” in describing a burden of proof is generally harmless error. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 341, pp. 346-347.) In support he cites to other volumes of his treatise and to a case,
 
 Valentine
 
 v.
 
 Provident Mut. L. Ins. Co.
 
 (1936) 12 Cal.App.2d 616 [55 P.2d 1243], in which there was no erroneous assignment of a burden of proof, merely an erroneous wording: “Defendant asserts that this language was error, because there is no duty of defendant to ‘overcome’ the presumption of death; that under the law defendant was chargeable only with ‘the burden of doing nothing more than producing evidence
 
 to offset
 
 the effect of plaintiff’s showing’ . . . .” (12 Cal.App.2d at p. 619, citation omitted.) The error was harmless. Witkin further explains that although minor errors in the burden of proof are often harmless, “. . . if the variance is such as actually to misstate the law and impose a greater burden of proof, it may be reversible error.” (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 306, pp. 352-353.) These passages and the case cited stand for the unremarkable proposition that minor errors are usually harmless, but major errors may not be. In our view giving the wrong party the burden of proof on a dispositive issue—a total bar to recovery— when the evidence on that issue is in dispute, is a major instructional error.
 

 However, we may not reverse a judgment for “misdirection of the jury” absent a miscarriage of justice. (Cal. Const., art. VI, § 13.) As stated in
 
 Soule
 
 v.
 
 General Motors Corp.
 
 (1994) 8 Cal.4th 548, 580-581 [34 Cal.Rptr.2d 607, 882 P.2d 298], we must evaluate “(1) the state of the
 
 *394
 
 evidence, (2) the effect of other instructions, (3) the effect of counsel’s arguments, and (4) any indications by the jury itself that it was misled.” (Fn. omitted.) We address these factors in order, then address another proffered factor.
 

 A.
 
 The state of the evidence.
 

 Here, the evidence stood in relative equipoise. The jury could reasonably have gone either way and therefore it is quite probable that the jury utilized the tie-breaking tool necessary to our system of factfinding: When in doubt, find against the party with the burden of proof.
 

 In addition to the balance in the evidence, there is the problem of the confusing and irrelevant evidence admitted regarding the Board’s nondetermination on the question of licensure. Very little of the Takimoto and Fallon testimony, if any, was admissible. The factual question regarding whether and how much work Laird performed was not helped by “expert” opinion (see 1 Witkin, Cal. Evidence,
 
 supra,
 
 The Opinion Rule, § 475, p. 447), therefore Takimoto’s conclusions could only confuse the jury. (See also
 
 Roy Brothers Drilling Co.
 
 v.
 
 Jones
 
 (1981) 123 Cal.App.3d 175, 179, 185 [176 Cal.Rptr. 449].) We also question whether the jury could follow the trial court’s admonition. Buzgheia contends all of the testimony was “administrative interpretation.” The investigators may testify about official interpretations of regulations, but not that the investigators believe the regulations mean such and such, or that
 
 the facts are such and such. (Culligan Water Conditioning
 
 v.
 
 State Bd. of Equalization
 
 (1976) 17 Cal.3d 86, 92-93 [130 Cal.Rptr. 321, 550 P.2d 593] [contrasting a position in a particular matter with an official ruling of general application]; see
 
 Ron Yates Construction Co.
 
 v.
 
 Superior Court
 
 (1986) 186 Cal.App.3d 337, 344-348 [230 Cal.Rptr. 629], cf.
 
 Currie
 
 v.
 
 Stolowitz, supra,
 
 169 Cal.App.2d at p. 814;
 
 Kelly
 
 v.
 
 Hill (1951) 104
 
 Cal.App.2d 61, 64 [230 P.2d 864].)
 

 This was the real “red herring” dragged over the case, which makes it quite likely that the jury was uncertain on the question of Laird’s bona fides and allowed the erroneous burden of proof instruction to govern.
 

 B.
 
 The effect of other instructions.
 

 No other instruction cured the error.
 

 The jury was instructed that Buzgheia had the burden to prove the facts necessary to establish his claim, that he had to have an RME as defined, and that “an individual such as Charles Laird is considered a ‘qualified’ RME
 
 *395
 
 only if that individual can establish that he was a ‘bona fide employee’ of the business entity which is using that person’s license,” what facts establish bona fides and “In determining whether any party to this lawsuit is liable for money damages to the other party, do not base such decision on whether you find plaintiff to be a duly licensed contractor at all times during the performance of contracts at issue herein.”
 

 These instructions do not impair the operation of the instructions on how to make such findings, particularly in the event a “tie-breaker” was needed. These instructions on the elements of Buzgheia’s case and the definition of an RME do not detract from the force of the instruction that told the jury
 
 Leasco
 
 bore the risk of nonpersuasion, meaning if the evidence were balanced Leasco should lose. The instructions simply tell the jury the facts it must find, and that Buzgheia has the burden to prove the elements of his causes of action. But the error is that a
 
 more specific
 
 instruction told the jury that Buzgheia did
 
 not
 
 have the burden of proof on a dispositive issue, namely, whether or not Laird was a bona fide RME. Witkin states, “It is particularly difficult to overcome the prejudicial effect of a misstatement when the bad instruction is
 
 specific
 
 and the supposedly curative instruction is general.” (7 Witkin, Cal. Procedure,
 
 supra,
 
 Trial, § 319, p. 364.) It is where the specific instruction is good, and the general one bad, that an error “is usually held cured.”
 
 (Id.
 
 at § 329, p. 373.)
 

 Witkin further states “the major source of reversal is the giving of erroneous instructions that misstate the substantive law, the rules of evidence, or the duties of judge and jury.” (7 Witkin, Cal. Procedure,
 
 supra,
 
 Trial, § 316, p. 360.) One example he gives is a case upholding a trial court’s grant of a new trial, where the burden of proof was stated both correctly and incorrectly,
 
 Bruck
 
 v.
 
 Adams
 
 (1968) 259 Cal.App.2d 585, 588 [66 CaLRptr. 395]. Here, of course, the only instruction on the specific issue of the burden of proof was incorrect. Although civil instructions may be arcane and although it is within the experience of all lawyers and judges that sometimes juries do not follow instructions, “. . . it is a fundamental and historic precept of our judicial system that jurors are restricted solely to the determination of
 
 factual
 
 questions and are bound by the law as given them by the court”
 
 (Noll
 
 v.
 
 Lee
 
 (1963) 221 Cal.App.2d 81, 87 [34 Cal.Rptr. 223]), and, as a corollary, “We must assume that the members of the jury were intelligent persons, and if they were they could not have misunderstood the instruction complained of.”
 
 (People
 
 v.
 
 Powell
 
 (1960) 186 Cal.App.2d 54, 59 [8 Cal.Rptr. 707].) The complained-of instruction in this case was
 
 wrong
 
 and placed the burden of proof on a dispositive issue on the wrong party.
 

 C.
 
 The effect of counsel’s arguments.
 

 The parties do not identify any portion of the arguments which corrected the error. Buzgheia emphasized “we’ve made a prima facie evidence that we
 
 *396
 
 are, in fact, a licensed contractor. [Sic.] And then [the] burden shifts to Mr. Williams to prove that we’re not a licensed contractor.” This did no more than restate the trial court’s instructions. But Buzgheia’s counsel emphasized the Takimoto and Fallon testimony, repeatedly referred to the licensure issue as a “red herring” and baldly stated that the Board “came back with a final ruling. And the ruling was: That Mr. Laird was a bona fide employee . . . .” This argument invited the jury to use testimony carrying a supposed “official” imprimatur for an improper purpose and minimized the importance of the jury making its own finding on this crucial issue. The effect of these arguments exacerbated the trial court’s instructional error.
 

 D.
 
 Indications the jury was misled.
 

 There is no express indication that the erroneous instruction misled the jury in any way, such as a note from the jury seeking rereading of particular testimony or clarifying instructions. Nor would the jury necessarily evidence the basis of its confusion in such a way: After all, the jury may have understood perfectly well that
 
 Leasco bore the burden of proof
 
 in other words, the erroneous instruction was readily understandable.
 

 Nor does any part of the verdict or interrogatories indicate the jury disregarded the erroneous instruction, or that it was harmless. Because the issue of due licensure is divorced from liability questions, and, as stated above, the jury was instructed to separate liability for damages from the licensure issue, it is not possible to infer from the verdict that the jury would not have come to another conclusion if properly instructed. This distinguishes this case from
 
 Rutherford
 
 v.
 
 Owens-Illinois Inc.
 
 (1997) 16 Cal.4th 953 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (Rutherford), where the verdict itself suggested that an erroneous burden of proof instruction made no difference. In
 
 Rutherford,
 
 “Briefly, the instruction, available in asbestos personal injury actions tried on a products liability theory, provides that if the plaintiff has proved that a particular asbestos supplier’s product was ‘defective,’ that the plaintiff’s injuries or death were legally caused by asbestos exposure generally, and that he was exposed to asbestos fibers from the defendant’s product, the burden then shifts to the defendant to prove, if it can, that its product was not a legal cause of the plaintiff’s injuries or death.” (16 Cal.4th at pp. 960-961.) The defendant was able to convince the jury that other asbestos companies were largely at fault, “In Rutherford’s case, the jury apportioned fault as follows: 1.2 percent to Owens-Illinois, 2.5 percent to Rutherford himself, and 96.3 percent to the remaining entities to which the jury was allowed to assign fault.”
 
 (Id.
 
 at p. 962.) The verdict, which accepted the defendant’s theory of damages in large measure, indicates that the adverse and erroneous burden of proof instruction did little harm to the
 
 *397
 
 defendant. Even with the wrong burden of proof, the defendant was able to convince the jury it bore little fault (1.2 percent) in causing the plaintiff’s injuries. “From the jury’s low estimate of defendant’s share of causation, it appears they resolved most of the factual uncertainty in defendant’s favor despite the burden-shifting instruction. In the absence of any instruction or evidence that a small amount was necessarily insubstantial, and guided by BAJI No. 3.77’s command that every contributing cause was a legal cause regardless of the degree of its contribution, the jury concluded even 1.2 percent of the cause was, on the facts of this case, substantial. A different result seems unlikely to have ensued had they been correctly instructed plaintiff bore the burden of showing exposure to [defendant’s product] was a substantial factor increasing the decedent’s risk of developing lung cancer.”
 
 (Id.
 
 at p. 985.)
 

 In this case, as stated, the jury was specifically instructed to keep liability and licensure separate and we presume it did so. Nothing in the structure of the verdict or size of the award sheds light on the licensure issue.
 

 E.
 
 Exclusion of evidence.
 

 An observation in
 
 Rutherford, supra,
 
 16 Cal.4th 953, has led Buzgheia astray.
 
 Rutherford
 
 reiterated the now-established
 
 Soule
 
 paradigm for instructional error analysis in civil cases. In the course of discussing the first factor, the state of the evidence, the court pointed out that “. . . the instruction in no way impaired defendant’s ability to put its full case on substantial factor causation before the jury. The burden-shifting instruction would not, by its nature, result in exclusion of relevant defense evidence, and nothing we have found in the record suggests the defense was precluded from presenting any evidence it possessed on the question of whether its produce was a substantial factor increasing plaintiff’s risk of cancer.” (16 Cal.4th at pp. 983-984.) The court then pointed out that each side had presented evidence on the relevant question, and found “other instructions minimized the importance of burden of proof,” and “the jury’s verdict suggests that, regardless of the burden shift, it accepted much of’ the defense theory.
 
 (Id.
 
 at pp. 984-985.) Nowhere did
 
 Rutherford
 
 suggest it was adding an additional factor to the
 
 Soule
 
 formulation. It is difficult to see how an erroneous instruction
 
 on the burden of proof
 
 would result in the exclusion of evidence, but if it did, that would certainly add weight to the prejudice side of the scale. But the fact that an erroneous instruction
 
 did not
 
 result in the exclusion of evidence adds nothing to a finding of harmlessness. For this reason, and because
 
 Rutherford
 
 relied on other factors to find the error harmless,
 
 Rutherford
 
 avails Buzgheia naught.
 

 
 *398
 
 F.
 
 Conclusion.
 

 The jury was specifically told that Leasco had the burden to prove Laird was not a bona fide RME. Whether or not Laird was a bona fide RME was a close question, with substantial evidence on both sides. Further, confusing and irrelevant evidence suggesting that the government had found Laird was a bona fide RME—evidence relied on by Buzgheia in argument—made it more likely that the jury made its decision by resorting to the burden of proof instruction. Nothing in the verdict or other instructions suggests the error on the fundamental issue of burden of proof was harmless. It is reasonably likely that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)
 

 III
 
 *
 

 Disposition
 

 The judgment is reversed and the cause is remanded to the trial court for further proceedings not inconsistent with this opinion. The parties shall bear their own costs.
 

 Nicholson, Acting P. J., and Sparks, J.,
 
 †
 
 concurred.
 

 A petition for a rehearing was denied January 16, 1998, and respondent’s petition for review by the Supreme Court was denied April 15,1998. Brown, J., was of the opinion that the petition should be granted.
 

 *
 

 See footnote,
 
 ante,
 
 page 374.
 

 †
 

 Retired Associate Justice of the Court of Appeal, Third District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.