Filed 2/14/14  Ondraka v. Bochinski, Inc. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JOSEPH ONDRAKA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BOCHINSKI, INC., et al., <br><br> Defendants and Respondents. | D060970 <br><br><br><br> (Super. Ct. No. GIN55193) |


APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge. Affirmed.

David A. Kay for Plaintiffs and Appellants.

No appearance for Defendants and Respondents.


INTRODUCTION

Joseph and Annette Ondraka appeal from a judgment awarding them a net amount

of $3,697 in their action against Bochinski, Inc. (corporation) and Stephen Bochinski

(Bochinski) for breach of contract and other claims. They contend we must reverse the judgment because the court: (1) did not allow them to establish the invalidity of the corporation's contractor's license through alter ego evidence; (2) mistakenly determined Business and Professions Code section 7159[1] did not apply; (3) mistakenly determined the parties modified the change order procedures in their contract by their conduct; (4) failed to interpret key contract provisions against the corporation as the contract drafter; (5) mistakenly found Bochinski's testimony credible; (6) awarded the corporation an excessive amount on its cross-complaint; and (7) deprived them of due process of law. We conclude each of these contentions lacks merit and affirm the judgment.

## BACKGROUND

The Ondrakas contracted with the corporation, a general contracting firm run by Bochinski, to build a main house on their property (project). The corporation had previously built a guest house on the same property. Under the terms of the contract, the corporation agreed to furnish all labor, materials, equipment and other facilities required to complete the project according to certain plans prepared by the Ondrakas' architect. The Ondrakas agreed to pay the corporation $730,487.13, "subject to adjustments for [c]hanges in the work as may be agreed to by the [parties]" or required by the contract. Exhibit 2 of the contract contained a cost breakdown specifying both the work covered by the contract as well as the work outside the scope of the contract for which the Ondrakas were solely responsible.

---

[1] Further statutory references are also to the Business and Professions Code unless otherwise stated.

2

The contract identified November 1, 2005, as the approximate project completion date. The Ondrakas negotiated for this completion date because of financing concerns if the project was not completed within one year. The contract further provided that "[t]ime is of the essence" and required the corporation to give the Ondrakas a progress and completion schedule (schedule) and to conform to the schedule, including to any agreed upon schedule changes, schedule changes otherwise allowed under the contract, or schedule changes required by circumstances beyond the corporation's control. Nonetheless, the contract excused the corporation for any delay in completing the project caused by, among other occurrences, acts of the Ondrakas or their agents and unforeseen contingencies beyond the corporation's control.

The contract permitted the Ondrakas to change the project's scope of work with written notice to the corporation. If the Ondrakas' changes, plan errors, or circumstances beyond the control of the corporation required an adjustment to the contract price or schedule, the corporation was to submit an estimate of the adjustment to the Ondrakas. Any price adjustments were to be generally consistent with the contract's pricing structure. However, to the extent the contract's pricing structure was inapplicable, the contract provided "the cost of the [c]hange and/or the adjustment to the [schedule] shall be determined by time and materials on the basis of the cost to the [corporation] plus five percent (5%) for overhead, and fifteen percent (15%) for supervision and profit." The corporation was not required to perform a change until it and the Ondrakas agreed in writing on the specifics of the change, the cost or credit for it, and the schedule adjustment.

3

If the Ondrakas failed to make a payment required by the contract, the contract permitted the corporation to suspend its work until paid. Similarly if the Ondrakas disputed a change or payment for a change, the contract permitted the corporation to suspend its work until the dispute was resolved.

The contract also permitted the Ondrakas to terminate the work at their convenience with written notice to the corporation. If the Ondrakas terminated the work, they had to pay the corporation its actual costs for the work performed up to the termination date, as well as the actual costs incurred because of the termination, plus 20 percent for supervision and profit.

As the project progressed, the parties did not follow the contract's change order procedures. Instead, Bochinski would verbally advise the Ondrakas when a change was necessary, or the Ondrakas would verbally advise Bochinski about a change they desired. Bochinski would give the Ondrakas a general price range for the change and the corporation would bill for the change on a time and materials basis. There was rarely any discussion or written statement regarding the effect of the change on the project's timing.

While the parties dispute the cause, they agreed there were substantial delays in completing the project. The project was still being framed in November 2005, and in December the Ondrakas had to obtain an extension of their construction loan. At that point, the corporation estimated the project would take another six months to complete.

Further straining the parties' relationship, a billing dispute arose over the application of the contract's overhead surcharge provision. The Ondrakas believed the

4

surcharge applied only to labor and materials. The corporation believed the surcharge applied to labor, materials, supervision, and profit.

On June 13, 2006, Joseph sent the corporation a memo stating the Ondrakas would no longer pay any supervision, profit or overhead surcharges until they received an accounting for the overhead surcharges incurred to that point. The next day Bochinski visited the Ondrakas to discuss the issue. After a heated exchange between Annette and Bochinski, the corporation declined to continue working on the project, which was then only 60 to 65 percent complete. A few days later, the Ondrakas notified the corporation they were terminating the contract. The project was completed without further involvement from the corporation.

Two months after terminating the contract, the Ondrakas sued the defendants. Their operative second amended complaint included causes of action for breach of contract, negligence, negligent misrepresentation, intentional misrepresentation, and violation of multiple Business and Professions Code provisions. The complaint also alleged the corporation was Bochinski's alter ego and the corporation was not a licensed contractor. The corporation filed a cross-complaint against the Ondrakas for failing to pay for work completed before contract termination.

After a lengthy bench trial, which did not include a trial of the Ondrakas' alter ego claims, the court issued a statement of decision finding each party had breached the contract in certain respects and awarding the Ondrakas net damages of $3,697.

DISCUSSION

I

*Corporation's Licensure*

A

The Ondrakas' original and first amended complaints alleged on information and belief that the corporation was a licensed general building contractor. However, their second amended complaint alleged that, while the corporation held itself out as a licensed contractor, it was not licensed because it did not comply with all of the formalities necessary to be a valid corporation. The second amended complaint additionally alleged the corporation was Bochinski's alter ego and he was not a licensed contractor either.[2] Based on the corporation's alleged lack of proper licensure, the Ondrakas sought the return of all monies they paid the corporation for the construction of the main house under section 7031, subdivision (b).

The court decided against the Ondrakas on this point. The court found that, because the Ondrakas had admitted the corporation was licensed in their original complaint, they had not controverted the corporation's licensure. In addition, the court found the corporation had established it was duly licensed by producing a verified license certification from the Contractors' State License Board. The court further found the

---

2    The parties do not dispute Bochinski did not have a contractor's license. They also do not dispute he was not required to have a license as long as the corporation had a valid license.

6

Ondrakas had not established the corporation's failure to comply with various close corporate formalities allowed them to recover under section 7031.

The court made its findings without the benefit of alter ego evidence because the court bifurcated and ultimately never tried the Ondrakas' alter ego claims. On appeal, the Ondrakas contend we must reverse the judgment and allow them to establish through alter ego evidence that the corporation was a sham and, therefore, the corporation's license was invalid.

B

Generally, a contractor may not sue to recover money for performing work for which a license is required unless the contractor alleges the contractor was duly licensed at the time the contractor performed the work. (§ 7031, subd. (a).) Concomitantly, "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract." (§ 7031, subd. (b).) When controverted, the licensee has the burden of establishing licensure or proper licensure, which "shall be made by production of a verified certificate of licensure from the Contractors' State License Board." (§ 7031, subd. (d).)

Assuming, without deciding, the Ondrakas properly controverted the corporation's licensure, the corporation met its burden of establishing its licensure by producing the requisite verified certificate. Nonetheless, relying on *Wright v. Issak* (2007) 149 Cal.App.4th 1116 (*Wright*) and *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374 (*Buzgheia*), the Ondrakas contend the court should have allowed them to present

7

alter ego evidence to establish the corporation's license was invalid because the corporation itself was invalid for not complying with necessary corporate formalities.

In both *Wright* and *Buzgheia*, the courts permitted challenges to facially valid contractor's licenses with evidence of circumstances which, if established, resulted in the licenses' automatic suspension under specific statutes. (*Wright*, *supra*, 149 Cal.App.4th at pp. 1120-1122; *Buzgheia*, *supra*, 60 Cal.App.4th at pp. 385-387.) The Ondrakas, however, have not identified any statute providing a corporate contractor is not duly licensed if it does not comply with corporate formalities. They also have not identified any statute providing for the automatic suspension of a corporation's contractor's license in such circumstances.[3] Accordingly, they have not established that the court prejudicially erred by failing to permit them to present evidence of such noncompliance. (See *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 702-703 [Section 7031 does not preclude a contractor's recovery where the contractor purportedly violated licensing laws, but no statute automatically suspended the contractor's license or rendered it invalid due to the violations].)

---

[3]   Section 7076.2, subdivision (a), provides for the automatic suspension of a corporation's license if the corporation, after 30 days' notice, fails to provide satisfactory proof it is registered and in good standing with the Secretary of State. The Ondrakas do not cite or rely upon this statute nor do they suggest they can present evidence showing the corporation received or failed to respond to such a notice.

## II

### *Application of Section 7159*

#### A

The Ondrakas' causes of action against the defendants included a claim the contract was invalid because it violated section 7159 in multiple respects. However, the court determined section 7159 did not apply because the contract was not a "home improvement" contract within the meaning of the statute. The Ondrakas dispute this determination, but we agree section 7159 does not apply here.

#### B

Section 7159 "identifies the projects for which a home improvement contract is required, outlines the contract requirements, and lists the items that shall be included in the contract." (§ 7159, subd. (a)(1).) A "home improvement contract" is a contract between an owner or tenant and a contractor for the performance of a home improvement priced at more than $500. (§§ 7151.2, 7159, subd. (b).) " 'Home improvement' means the repairing, remodeling, altering, converting, or modernizing of, or adding to, residential property." (§ 7151.) It includes "the construction, erection, replacement, or improvement of driveways, swimming pools, including spas and hot tubs, terraces, patios, awnings, storm windows, landscaping, fences, porches, garages, fallout shelters, basements, and other improvements of the structures or land which is adjacent to a dwelling house." (*Ibid.*) Essentially then, "[a] 'home improvement contract' is a contract . . . that provides for the remodeling, alteration, repair, or improvement of a

personal residence, in excess of $500." (Miller & Starr, Cal. Real Estate (3d ed. 2010), § 27:55, p. 27-240.)

The evidence in this case shows the Ondrakas contracted with the corporation for the construction of a separate, primary residence. It does not show they contracted for the remodeling, alteration, repair, or improvement of their existing guest house. Accordingly, the court correctly determined section 7159 did not apply.

Moreover, contracts made in violation of section 7159 are not necessarily void. They may be enforced in appropriate cases to avoid unjust enrichment. (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 292-293; *Arya Group, Inc. v. Cher* (2000) 77 Cal.App.4th 610, 615-616.) As the Ondrakas have not established, or attempted to establish, the corporation's alleged violations of section 7159 would have precluded enforcement of the contract, they have not established they were prejudiced by the court's failure to apply section 7159.

III

*Written Change Orders*

A

The parties' contract specified procedures for change orders, including requiring written notice of the proposed change, a written estimate of the price of the changes, and a written agreement to the changes signed by both parties. The court found neither party complied with nor insisted the other party comply with these procedures. Instead, the parties consistently addressed change orders informally. The court, therefore, found the parties modified the contract's change order procedure by their conduct. Alternatively,

10

the court found the Ondrakas waived compliance with the formal change order procedure.

On appeal, the Ondrakas contend the court erred in its determination because "[e]xisting contract law does not provide for the oral modification of required written contract terms by 'conduct' or implicit waiver." Instead, under existing law, they contend the change order procedure could not be orally modified unless the modification was supported by new consideration, which did not occur. We conclude there is no merit to these contentions.

B

The Ondrakas support their position by citing to Civil Code section 1698, subdivision (c), which provides in part: "Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration." Assuming, without deciding, this code section applies to this case, it is not dispositive as subdivision (d) of the code section provides: "Nothing in this section precludes in an appropriate case the application of rules of law concerning . . . waiver of a provision of a written contract." As the court correctly noted, parties may by their conduct waive a requirement for a contract modification to be in writing if evidence shows the modification conforms to their intent. (*Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141). Since the Ondrakas do not dispute the evidence supports the court's finding in this respect, the Ondrakas have not established the court erred in determining the corporation did not breach the contract by failing to follow the contract's change order procedure.

11

IV

*Interpreting Contract Against Corporation*

The Ondrakas contend the court erred by failing to interpret several contract provisions against the corporation as the drafter of the contract. To support their position, they rely on Civil Code section 1654, which provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." However, Civil Code section 1654, does not apply unless other canons of construction fail to dispel the uncertainty. (*Decter v. Stevenson Properties* (1952) 39 Cal.2d 407, 418; *California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 145; *Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448.) The Ondrakas do not discuss how the court arrived at the challenged interpretations or why the court did not or could not rely on other canons of construction. Consequently, they have not established the court erred by failing to apply Civil Code section 1654 in this case.

V

*Bochinski's Credibility*

The Ondrakas contend the court improperly evaluated their fraud claims because, for various stated reasons, the court mistakenly found Bochinski's testimony was credible. We note that none of the Ondrakas' arguments on this point is supported with citation to authority. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to

support it with reasoned argument and citations to authority, we treat the point as waived." ' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

Additionally, because the evaluation of a witness's credibility necessarily involves consideration of the witness's demeanor and manner of testifying, the evaluation is not susceptible to appellate review. (*Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 141.) "The law has long recognized the problem of appellate review in the matter of credibility of witnesses based upon their demeanor, and for that reason the rule has evolved that the trier of facts is the sole and exclusive judge of the credibility of witnesses as determined by their demeanor. . . . [¶] On the cold record a witness may be clear, concise, direct, unimpeached, uncontradicted—but on a face to face evaluation, so exude insincerity as to render his credibility factor nil. Another witness may fumble, bumble, be unsure, uncertain, contradict himself, and on the basis of a written transcript be hardly worthy of belief. But one who sees, hears and observes him may be convinced of his honesty, his integrity, his reliability. All of this is because a great deal of that highly delicate process we call evaluating the credibility of a witness is based on what might be called, for lack of a better word, 'intuition'—that intangible, inarticulable capacity of one human being to evaluate the sincerity, honesty and integrity of another human being with whom he comes in contact. There is no way of knowing or proving how much of the testing process is encompassed in the 'traditional' tests of credibility such as provable bias or interest, contradiction or impeachment, all demonstrable on the record, and how much of that evaluation process comes from the purely subjective

13

reaction of the trier of facts to the attitude, demeanor and manner of testifying of the witness—not demonstrable on the record." (*Id.* at pp. 140-141.)

VI

*Excess Award*

The court awarded the corporation $66,959 on its cross-complaint against the Ondrakas. The Ondrakas contend this amount was excessive because the corporation only requested an award of $20,610.38 in its cross-complaint. Neither the record nor the law supports this contention.

The record does not support this contention because a fair reading of the corporation's cross-complaint indicates the corporation did not limit its damages claim to $20,610.38. Rather, the corporation sought damages "in the sum of $20,610.38 for work performed under [the contract], *plus such additional compensatory and consequential sums including, without limitation, costs of delay, costs of termination, lost profits, and investigation costs resulting from said breaches, all in an amount to [be] proven at trial . . . .*" (Italics added.)

Even if the corporation had limited its damages claim to $20,610.38, the corporation was not necessarily barred from recovering additional damages. In a contested action, "the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue." (Civ. Proc. Code, § 580, subd. (a); *American Motorists Ins. Co. v. Cowan* (1982) 127 Cal.App.3d 875, 883 [following a trial on the merits, the court may grant any form of relief supported by the evidence and to which the parties had notice, whether the relief was requested in the pleadings or not].)

14

Further, the court admitted evidence showing the corporation sustained $66,950 in damages from the Ondrakas' breach of the contract. "The parties thus actually tried the issues of damages in amounts above the limits set forth in the body of the complaint. The amount of the trial court's judgment on those issues therefore could not have come as any surprise to [the Ondrakas] and was the source of no prejudice to [them] since no additional time or effort by [them] was required to meet those issues." (*Castaic Clay Manufacturing Co. v. Dedes* (1987) 195 Cal.App.3d 444, 450; see also, *Grubb & Ellis Co. v. Bello* (1993) 19 Cal.App.4th 231, 241 [in a contested case, a prayer which seeks the wrong or inadequate relief is not a serious defect].)

VII

*Due Process Violations*

A

The court conducted the bench trial in this case over 15 days between March 22 and April 29, 2010. At the outset of the trial, the court deferred all rulings on relevancy objections. The court explained it did not believe there was a need to be terribly concerned about relevancy objections for a bench trial. It also assured the parties it would not be basing its decision on irrelevant information.

The parties' trial estimate was 10 days. On the eighth day of trial, in the midst of the Ondrakas case-in-chief, it became clear to the court the parties would exceed their estimate. After a chambers meeting to discuss scheduling, the court determined it would be unreasonable to allow the presentation of evidence to exceed counsel's estimate by more than 50 percent. Consequently, the court limited the parties' presentation of

15

evidence to a total of 15 days, with four of the days allocated to the corporation and Bochinski and the remainder to the Ondrakas.

Between May and mid-June 2010, the parties filed written closing arguments and in mid-July, they apparently orally argued their respective positions for an entire day.[4] They then submitted supplemental closing briefs between early August and early September. The Ondrakas' supplemental closing brief included relevancy objections to all or part of 23 exhibits. The corporation and Bochinski responded to the objections in one of their supplemental closing briefs.[5]

The court ordered the matter submitted on September 9, 2010. In November, the court vacated its submission order pending "the preparation of transcripts of certain of the witnesses' testimony." The court ordered the matter resubmitted in February 2011. The court subsequently discovered the transcripts of two primary witnesses' testimony were incomplete. After receiving the completed transcripts, it again ordered the matter resubmitted as of April 11, 2011.

The court issued a proposed statement of decision on June 30, 2011, and directed the parties to file any objections to it in accordance with rule 3.1590(d) of the California Rules of Court. On July 13, the Ondrakas filed a request for statement of decision seeking the factual and legal bases for the court's decision on 81 issues. Two days later, the court struck the request because the court had already issued a proposed statement of

---

[4] The corporation and Bochinski's written closing arguments are not in the record. In addition, there is no transcript of the oral arguments in the record.

[5] None of the challenged exhibits are in the record.

16

decision. The court then granted the Ondrakas 10 days' leave to file and serve any objections to the proposed statement. The court additionally advised the Ondrakas, "A seriatim list of the sort contained in the stricken request is not sufficient, particularly given the fact that most of the listed issues were addressed in the proposed statement. Rather, the objections should identify specific alleged defects in the proposed statement with a clear and concise explanation why the factual determinations are not supported by the trial record or why the legal reasoning is in error. The objections should also identify any necessary issues that were not addressed in the proposed statement, explaining why reaching those issues is necessary to the decision in light of the [c]ourt's reasoning. *In this regard, in particular, [the Ondrakas'] counsel should explain why resolution of the bifurcated alter ego claims . . . is required and, if so, how those remaining issues should be tried.*" (Italics added.)

On July 25, 2011, the Ondrakas filed objections to the proposed statement. Their objections did not address the bifurcated alter ego claims. The corporation and Bochinski filed their response to the Ondrakas' objections on August 18. The court issued its final statement of decision on September 12. The statement of decision did not address the relevancy objections or the bifurcated alter ego claims. Given the Ondrakas' failure to address the alter ego claims in their objections to the proposed statement, the court determined the Ondrakas had waived them.

B

The Ondrakas contend the court deprived them of due process of law by deferring and then failing to rule on their relevancy objections, by imposing strict time limits on the

17

trial that precluded them from calling all the witnesses they wanted to call, by taking 18 months to complete the proposed statement of decision, by rendering a decision when it only had access to part of the trial transcripts, and by failing to conduct the bifurcated portion of the trial before completing proposed statement of decision. We conclude there is no merit to any of these points.

1

Regarding the relevancy objections, generally a court's failure to formally decide a reserved ruling on an evidentiary objection is an implied ruling in favor of admissibility and against the objection. (*Clopton v. Clopton* (1912) 162 Cal. 27, 32.) Although the practice of handling objections in this fashion is discouraged, an appellate court will not reverse a judgment because of this practice absent a showing of prejudice. (*Ebner v. West Hollywood Transfer Co.* (1919) 45 Cal.App. 186, 191.) No prejudice exists where the challenged evidence was admissible. (*Casey v. Richards* (1909) 10 Cal.App. 57, 61.) In addition, we presume a court sitting without a jury did not base its decision on irrelevant evidence where there is competent evidence to support the decision. (*Southern California Jockey Club v. California Horse Racing Bd.* (1950) 36 Cal.2d 167, 176; *Monogram Industries, Inc. v. Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 704.) The Ondrakas have not included the challenged evidence in the record (see fn. 3, *ante*) or attempted to demonstrate any of it was inadmissible. They also have not attempted to rebut the presumption the court did not base its decision on irrelevant evidence. Accordingly, they have not established they were prejudiced by the court's failure to rule on the deferred relevancy objections.

18

Regarding the trial time limits, "courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. [Citation.] 'In addition to their inherent equitable power derived from the historic power of equity courts, all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority. [Citations.] "It is beyond dispute that 'Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.' [Citation.]" [Citation.] That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice.' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967.) We review a court's exercise of its inherent power for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 209.)

In this case, the record shows the court imposed time limits on the presentation of evidence after it became clear the parties would far exceed their trial estimate. Even with the time limits, the court permitted the parties to exceed their trial estimate by 50 percent and allocated more than two-thirds of the available time to the Ondrakas. The court also permitted the parties to present extensive written and oral closing arguments. Although the time limits may have prevented the Ondrakas from presenting all of their character evidence, they were able to present the key evidence in their case, including their own testimony and their expert's testimony. They were also able to extensively question

Bochinski, whose testimony had more direct bearing on the assessment of his credibility than any character evidence would have had. Accordingly, we cannot conclude the court abused its discretion in imposing the time limits.

3

Regarding the time lapse between the end of the trial and the court's issuance of the statement of decision, the Ondrakas perfunctorily assert without citation to authority that the time lapse was prejudicial under the circumstances and, therefore, warrants reversal. "One cannot simply say the court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.) In addition, as we have previously noted, " '[a]n appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration." ' " (*Ibid.*)

Moreover, the record shows the time lapse was not due to any dereliction on the court's part. Several months were consumed by the parties' submission of written and oral closing arguments. Most of the rest of the time was consumed waiting for transcripts of the principal witnesses' testimony. After receiving the transcripts and finally submitting the matter, the court produced a 32-page proposed statement of decision in approximately a month and a half. The statement included a detailed factual and legal analysis of the parties' respective claims. The Ondrakas do not assert there is insufficient evidence to support any of the court's findings. Accordingly, they have not demonstrated either that the time lapse was error or that it prejudicially harmed them.

20

Finally, the Ondrakas contend that we must reverse the judgment because the court failed to conduct a bifurcated trial on their alter ego claims. They have forfeited this contention because they have provided no analysis or authority supporting it. (*Niko v. Foreman*, *supra*, 144 Cal.App.4th at p. 368.) They have also forfeited this contention because the court specifically invited them to explain why, in light of the proposed statement of decision, it was necessary to try their alter ego claims and they did not accept the court's invitation. (See Code Civ. Proc., § 634, *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 497-498; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [failure to raise specific objections to omissions or ambiguities in a statement of decision waives the right to challenge the omissions or ambiguities on appeal].) Although they assert on appeal the evidence was necessary for them to challenge the corporation's licensure, we are not persuaded by this assertion for the reasons stated in part I, *ante*. Accordingly, the Ondrakas have not demonstrated the court's failure to conduct a trial on their alter ego claims was prejudicial error. (See *Domach v. Spencer* (1980) 101 Cal.App.3d 308 313 [where findings are made on issues which determine cause and uphold judgment, other issues are immaterial and failure to make findings on them does not constitute prejudicial error].)

DISPOSITION

The judgment is affirmed. Respondents are awarded their appeal costs.


McCONNELL, P. J.

WE CONCUR:


NARES, J.


AARON, J.