Filed 6/15/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ART WOMACK,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>        v.<br><br>DAVID ANGUS LOVELL et al.,<br><br>    Defendants, Cross-complainants and Appellants;<br><br>MARK CABALLERO,<br><br>     Cross-defendant, Cross-complainant and Respondent. | G049587<br><br>(Super. Ct. No. 30-2011-00438896)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Derek W. Hunt, Judge.  Affirmed in part, reversed in part and remanded with directions.

Law Offices of Lenore Albert and Lenore L. Albert for Defendants, Cross-complainants and Appellants.

Law Office of Mitchell B. Hannah, Mitchell B. Hannah and Hallie D. Hannah for Plaintiff, Cross-defendants, Cross-complainant and Respondents.

## I. INTRODUCTION

In his rock and roll standard, "End of the Innocence," Bruce Hornsby notes that "The lawyers dwell on small details." That's true. We have to. The devil isn't the only resident in the details; sometimes truth and fairness lodge there as well.

In this case, we address a "detail" that was lost or hidden and resulted in what we consider an injustice. Fortunately, as is usually the case, painstaking attention to other small details enables us to correct this injustice. If you dwell on small details with an eye to fairness, the law works well.

Here, a homeowner sued a general contractor for allegedly shoddy and incomplete work in connection with a major home remodeling contract. The homeowner's complaint also contained a cause of action against the general contractor's license bond company, seeking to recover for the contractor's having "grossly deviated" from the plans and specifications for the job. To support his action, the homeowner explicitly alleged in the complaint that the contractor was licensed at all times.

For his part, the general contractor responded with a cross-complaint against the homeowner for unpaid work. The cross-complaint included a copy of their written contract which showed the contractor's license number. To that, the homeowner simply filed a general denial of all allegations.

When the case came to trial, the homeowner – contrary to the applicable local rule requiring plaintiffs to identify all controverted issues – did not identify licensure as a controverted issue. The contractor's attorney seeing no issue, did not obtain a verified certificate from the Contractors' State License Board (the License Board) showing the contractor was licensed at all times during his performance. But when the contractor was about to rest his case on the cross-complaint, the homeowner's attorney made a motion for nonsuit based on the absence of such a verified certificate as

2

required under Business and Professions Code section 7031, subdivision (d), when the issue of licensure is "controverted."[1]

The trial judge was also surprised the licensure issue was raised. He hadn't been expecting the issue either. He deferred immediate ruling on the homeowner's nonsuit motion. As the contractor learned to his chagrin, it presently takes at least six days to obtain a verified certificate from the License Board even if one drives overnight to Sacramento to pick it up in person. While the contractor was eventually able to obtain a verified certificate of licensure from the License Board, he could not do so until after the close of the trial, in which he prevailed on his claim for unpaid work from the homeowner. Because no certificate of licensure could be produced, the trial judge reluctantly granted the homeowner's nonsuit motion, by then denominated a motion for judgment notwithstanding the verdict (JNOV), and this appeal ensued.

We reverse the judgment in favor of the homeowner, with instructions to the trial judge to grant judgment in favor of the general contractor as against the homeowner. We conclude this is one of those relatively rare cases where a party can be bound by a judicial admission made in an unverified complaint. (See *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 836-837 (*Reichert*) [circumstances of case justified holding party to admission made in unverified complaint].) Here, the judicial admission that the general contractor was licensed, compounded by the homeowner's failure to comply with the local rule requiring identification of all controverted issues, rendered the question of licensure assuredly *uncontroverted* for purposes of section 7031. Because of

---

[1] "*If* licensure or proper licensure is *controverted*, then proof of licensure pursuant to this section shall be made by production of a verified certificate of licensure from the Contractors' State License Board which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action. Nothing in this subdivision shall require any person or entity controverting licensure or proper licensure to produce a verified certificate. When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee." (Italics added.)

In this opinion all undesignated references are to the Business and Professions Code, and all undesignated references to any subdivision of a statute are to section 7031.

3

the judicial admission, the rule of *Advantec Group, Inc. v. Edwin's Plumbing Co., Inc.* (2007) 153 Cal.App.4th 621 (*Advantec*) does not apply.

## II. FACTS

This litigation arises out of a 2010 Laguna Hills home remodel undertaken by Art Womack. Womack hired a general contractor named Aztec Sunpower (Aztec).[2] Aztec, in turn, hired a pool subcontractor, Caballero Pools and Spas (Caballero). By the end of 2010, the relationships had broken down to the point where litigation was imminent.

Womack filed first in January 2011, his complaint alleging breach of contract by Aztec. His first amended complaint, filed in July 2011, alleged Aztec had done an incomplete and sloppy job and thus forced him to incur extra expenses to make things right.

In his first amended complaint, Womack alleged twice that Aztec "at all times" relevant to the suit, "acted in the capacity as a licensed contractor." The first time was in the standard list of parties often given at the beginning of a complaint. The second time was in connection with a fourth cause of action "on contractor's license bonds" against American Contractors License Indemnity Company (American Contractors). In that cause of action Womack alleged that "upon application" by Aztec "to the Registrar of Contractors of the Contractor's State License Board of the State of California for a contractor's license or renewal thereof, and in accordance with the provisions of section 7071.6 of the *Business and Professions Code* of State of California," Aztec had "filed with the Registrar bonds issued by" American Contractors, "bond number 1000112982 in the sum of $12,500, conditioned upon full compliance" by Aztec "with all the provisions of Division 3, Chapter 9, of the *Business and Professions Code* of the State of California

---

2 Technically, Aztec is the dba of DA Lovell Corp. We call DA Lovell Corporation "Aztec" because that's how the judgment refers to it.

4

inuring to the benefit of any person damaged as a result of a violation of the Chapter by the Defendant's licensees." The pleading was unverified.

About a year later, in February 2012, Aztec responded with a cross-complaint against both Womack and Caballero, alleging they unfairly cut Aztec out of the job. Aztec's cross-complaint alleged it had been a licensed contractor continuously in good standing with the state contractor's board for the past 20 years.

In April 2012, both Womack and Caballero, represented by the same law firm, filed answers to Aztec's cross-complaint. Each answer generally denied all of Aztec's allegations, which necessarily included the allegation Aztec had been a licensed contractor at all relevant times, a small detail that went unnoticed.

Also in April 2012, Caballero filed his own cross-complaint against Aztec, alleging damages arising out of its breach of contract. In contrast to Womack's earlier complaint, however, Caballero's cross-complaint did *not* allege Aztec was at all times a licensed contractor. Caballero merely alleged Aztec had "represented" itself to be a contractor.

Three days before a September 30, 2013 trial date, Womack and Caballero's law firm filed a "joint list of stipulated facts and controverted issues," though calling it either "joint" or a "list" would be a stretch. It was not joint – certainly not in the sense of reflecting a document agreed to by adversarial parties. The document was neither signed by Aztec's counsel nor, as far as we can ascertain, ever served on her. Nor was it a list. It merely stated the parties had stipulated a certain surety bond company had issued a bond to Aztec for a certain period and then said "All other issues are controverted," without identifying any of them.

The trial was continued, and on November 5, just before trial was about to begin, counsel for American Contractors (Aztec's bonding agent) and Womack announced in open court (with counsel for Aztec present) that they had a settlement. Counsel for Womack articulated its terms for the record: They agreed that American

5

Contractors had "issued surety bond number 1000112982 in the amount of $12,500 to DA Lovell Corp., which does business as Aztec Sunpower. [¶] The bond was in effect from February 10th – yeah, February 5th, 2010 through March 23rd. 2012. [¶] American Contractors Indemnity Company agrees that if plaintiff Art Womack obtains a net recovery of at least $12,500 for DA Lovell Corp. [dba Aztec], that American Contractors Indemnity will pay to Art Womack up to $12,500 from the penal sum of the bond. [¶] If the net is less than $12,500, American Contractors Indemnity shall only be obligated to pay the net recovery, not to exceed $12,500. [¶] And the parties agree that the court will retain jurisdiction pursuant to CCP 664.6 to enforce this settlement."

Trial then proceeded, and on November 6 the issue of Aztec's licensure came up late in the afternoon, soon after Aztec's owner, D.A. Lovell, took the stand and began testifying as to Aztec's licensure status. It was at that point Womack and Caballero's counsel played the *Advantec* card, asserting the issue of licensure had been controverted, so there was a fatal omission in Aztec's now-almost completed case: Aztec had produced no verified certificate of licensure.

The trial judge was taken aback. He reminded defense counsel he had asked at the "outset" of the case whether there were any "dispositive affirmative defenses," and had heard not a word about the licensure issue. The short colloquy ended with the judge deciding to delay ruling on the matter until sometime after the end of the day.

That day Womack and Caballero's counsel filed written briefing on the subdivision (d) issue. It had obviously not been worked up ad hoc over the lunch hour. The gravamen of the briefing was: (1) Aztec's licensure had been "controverted" by virtue of the general denials filed by Womack and Caballero to Aztec's cross-complaint; (2) under Business and Professions Code section 7031, subdivision (d), proof of licensure may be shown *only* by a verified certificate of licensure from the state contractor's license board; (3) Aztec had failed to produce such a verified certificate (the implication

6

was that by this late date in the trial, Aztec was not going to be able to produce such a verified certificate in time)[3]; ergo (4) Aztec had failed to meet its burden of proof of showing licensure and, as the briefing put it, had to lose. "Period."

The next day, November 7, Aztec rested its case on the liability phase of trial. It is an interesting, but now academic question whether, under any circumstance, including *optimal* funding of the License Board in the best of all possible worlds, any contractor will ever be able to procure a verified certificate of licensure overnight. It certainly didn't happen here. Rather, immediately after Aztec rested, Womack and Caballero's counsel made an oral motion for nonsuit based on the brief they had filed the previous day.

It appears the trial judge had not yet had time to read that brief. So he denied Womack and Caballero's counsel's request to have him rule on the issue "immediately."[4] Rather, he said defense counsel could argue his motion the next day. If, in the interim, the jury came back with an adverse verdict, the motion could be treated as a motion for JNOV. As it turned out, the jury did come back with a verdict in the liability phase of the trial – first against Womack on his complaint, then in favor of Aztec on its cross-complaint, finding both Womack and Caballero had breached their contracts with Aztec.

Phase two, the trial on damages, remained so the jury was not dismissed. The next day, November 8, outside the presence of the jury, the judge entertained the motion. By this time there had been oral testimony Aztec was fully licensed, but there was no verified certificate of licensure. Aztec's lawyer contended there had been no need to produce such a certificate, pointing to Womack's first amended complaint, in which

---

[3]  Womack and Caballero's counsel's briefing treated the failure to produce the certificate in the past tense, as if a fait accompli, even though there were still a few hours left to go on the liability phase of trial to be completed the next day.

[4]  Womack and Caballero's counsel pleaded: "I can't get a ruling on that now? It's clear. It's clear."

7

Womack "admitted in his pleading that [Aztec] was a licensed contractor." The trial judge understood the point to be that Womack had made a judicial admission Aztec was so licensed. Womack and Caballero's counsel countered by citing the *Advantec* case. While the trial judge had read the case a couple of weeks prior to the trial, he had not read it for that day, so he again deferred ruling on the motion.

Four days later, on November 12, the jury returned a verdict on the damages issue in favor of Aztec: Womack owed Aztec $13,100, Caballero owed Aztec $4,340. Aztec's counsel told the judge she had ordered a verified certificate from the licensing board, but it wasn't ready yet. The trial judge correctly guessed Womack and Caballero's position would be that it made no difference. As he anticipated, in open court, Womack and Caballero's response to the fact that Aztec was now shown to have been licensed all along was, "*Advantec* case says that he wins anyway."

That day Aztec's counsel filed opposition to Womack and Caballero's earlier brief, again asserting Womack had made a judicial admission that Aztec was licensed. After a little more discussion, the parties agreed to resume argument two days later, on November 14. When the parties met again on November 14, the trial judge had made up his mind to grant the motion, based on *Advantec*.

Aztec's counsel once again asserted the argument Womack had made a judicial admission Aztec was "validly licensed." But the trial judge expressed his concern that, "there's no case on point in which that is recognized as an exception to the statute and the *Advantec* case." He added, "I just don't see any trend here that suggests that on my level, I should do that," though he added he was "rather sympathetic to the argument." The judge granted the motion, now effectively a motion for JNOV.

Aztec wasn't quite yet ready to throw in the towel. Someone drove to Sacramento on Aztec's behalf to pick up the verified certificate ordered earlier from the licensing board, and, on November 22, 2013, Aztec brought an ex parte motion to reconsider the JNOV, or alternatively for a new trial. Aztec's attorney presented a

8

declaration asserting she hadn't had notice from any of the pleadings licensure would be put at issue.  According to her declaration, the board takes from six to ten days to complete a request for such a verified certificate.

It didn't work.  The trial judge signed a judgment in favor of both Womack and Caballero.  A notice of appeal was timely filed.

## III.  DISCUSSION

A.  *Background*

Subdivision (a) of section 7031 operates to deny access to the courts to contractors who were not licensed at all times during their performance.  (E.g., *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 423; *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 (*Hydrotech*); *E.J. Franks Construction, Inc. v. Sahota* (2014) 226 Cal.App.4th 1123, 1128 (*E.J. Franks*); *Alatriste v. Cesar's Exterior Designs, Inc.* (2010) 183 Cal.App.4th 656, 665-666.)  That proposition is dog bites man.

Less well known is subdivision (d) of section 7031, which requires production of a verified certificate of licensure when the issue of licensure is controverted, and so can operate to deny even *licensed* contractors any compensation.  *That* phenomenon is man bites dog.  (See Von Esch, *The Code Section That Could Cost You Your Construction Case* (May 2012) 54 O.C. Law. 20.)

The best illustration of this possibility – the spectre that haunted the trial judge here – is *Advantec, supra*, 153 Cal.App.4th 621.  There a developer hired a plumber, then terminated the plumber mid-job.  The developer sued for breach of contract.  (See *id.* at p. 625.)  The plumber cross-complained for breach of contract, and

9

of course alleged – it had to[5] – that it was licensed. The developer filed a general denial, sans any "specific challenge" to the plumber's licensure status. (*Ibid.*) The case went to jury trial, and when the plumber tried to establish licensure by his testimony, the court ruled that could only be accomplished by a verified certificate. The plumber's counsel then requested a continuance so as to be able to obtain a certificate from the License Board, but the developer's counsel already knew it would take at least two weeks, and told the court so. The court denied the continuance, and thereafter granted the developer's nonsuit motion on the plumber's cross-complaint based on the absence of a verified certificate. (*Id.* at pp. 625-626.) In the ensuing appeal the appellate court affirmed with implacable logic: First, subdivision (d) requires a verified certificate if the issue of licensure is controverted, a general denial controverts the material allegations of the complaint, the plumber's allegation it was licensed was material, ergo the issue of licensure was controverted; second, the only way licensure could be proved was by producing a verified certificate, the plumber didn't produce a verified certificate at trial so the plumber lost. (See *id.* at pp. 627.)

The result was reminiscent of Sartre's play No Exit. There was no escape for the hopeless protagonist. The licensure issue could not be described as "new matter" requiring articulation in an affirmative defense (*Advantec, supra*, 153 Cal.App.4th at pp. 627-630), and, under an abuse of discretion standard, the denial of the continuance could hardly be said to be unreasonable, especially since the nonsuit motion came near the end of a *jury* trial that had already consumed four days (see *id.* at p. 631).[6]

---

[5]    Subdivision (a) *requires* an allegation the contractor is licensed. The single sentence subdivision provides in its entirety: "Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter *without alleging that he or she was a duly licensed contractor at all times during the performance* of that act or contract, regardless of the merits of the cause of action brought by the person, except that this prohibition shall not apply to contractors who are each individually licensed under this chapter but who fail to comply with Section 7029." (Italics added.)

[6]    The *Advantec* court embellished that point with some dicta on the interaction between section 7031 and equity (see *Advantec, supra*, 153 Cal.App.4th at pp. 630-631) to which we will return further on.

10

But the result in *Advantec* – and we do not disagree with the result or reasoning of the decision – is not without irony. The legislative history of section 7031, indicates that the potential within subdivision (d) to mislead licensed contractors into thinking no verified certificate was required was part of an effort by the Legislature to *prevent* licensed contractors from needlessly losing cases because a verified certificate could not be procured in time. That is our case.

The history of subdivision (d) is a history of a pendulum swinging, as the great legal philosopher Roger Miller would say, "like a pendulum do." Section 7031 has been around since 1939, when it was enacted as part of a comprehensive scheme to license contractors. (See Stats. 1939, ch. 37, § 1, pp. 382-395). In its original incarnation there were no subdivisions. It simply said that no person could "bring or maintain" any action for "any act or contract for which a license is required" without "alleging and proving" he, she or it was duly licensed at all times "during the performance" of the act or contract. And those key words have remained in the statute, in the form of subdivision (a), to this day.

A big change came in 1989, in the form of Assembly Bill No. 841 (AB 841). The sponsor of AB 841 was the License Board itself, and the Board's main purpose was to close what the License Board considered the "loophole" of the judicially-recognized substantial compliance doctrine, which allowed for the possibility of recovery for some unlicensed work.[7] The legislation took dead aim at the substantial compliance doctrine with a new subdivision, then subdivision (d), that sought to exclude all

---

[7]     We quote from the Legislative Analyst's Enrolled Bill Report of the State and Consumer Affairs agency dated August 29, 1989 (hereinafter Enrolled Bill Report) from the agency's director: "Unlicensed activity is a major enforcement problem for the CSLB. . . . [¶] This bill, according to the sponsor, would curtail unlicensed contracting activities by inhibiting unlicensed contractors' ability to secure compensation via the courts. The sponsor cites an apparent loophole in current law whereby unlicensed contractors have prevailed in court when seeking compensation for work which someone refuses to pay because the individual is unlicensed, on the rationale that the job was completed satisfactorily and that the unlicensed contractor had *substantially complied* with licensure requirements." (Italics added.)

11

possibility of the doctrine's application to contractor licensing actions.[8] It was AB 841 that first inserted a verified certificate requirement into section 7031 (see Stats. 1989, ch. 369. § 1, p. 1509) as former subdivision (c).[9]

But as written in the 1989 version of the statute, subdivision (c) had no "if controverted" clause. Rather, the requirement of a verified certificate was absolute. Contractors had to have a verified certificate of licensure to prove licensure, and they had to prove licensure to recover. The effect was that a verified certificate was required in every case. The theory behind the new need for a verified certification was tied to the overall purpose of AB 841, which was to eliminate the judicial doctrine of "substantial compliance." The point of a verified certificate was to provide a bright line criterion to verify licensure; without such a bright line it was feared courts might find a way to relapse into their old ways of excusing some unlicensed activity.[10]

But it didn't take long for the doctrine of unintended consequences to rear its ugly head. By 1992, the need to obtain a verified certificate *in every case* meant waits of up to six months for the necessary certificate. (See *Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 391 (*Buzgheia*), quoting Assem. Com. Consumer Protection, Gov. Efficiency and Economic Dev., Analysis of Assem. Bill No. 2413 (1991-1992 Reg. Sess.) May 6, 1992 (1992 Assembly Consumer Protection Analysis).)

The License Board, swamped by having gotten what it wished for in 1989, *again* sponsored an amendment to section 7031 in 1992. This was Assembly Bill No. 2413 (AB 2413), which headed in the other direction. AB 2413 was intended to

---

[8] The new subdivision (d) flatly said: "The judicial doctrine of substantial compliance shall not apply to this section." (Stats. 1989, ch. 369. § 1, p. 1509.)

[9] The 1989 version of subdivision (c) read as follows: "Proof of licensure pursuant to this section shall be made by production of a verified certificate of licensure from the Contractors' State License Board which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action."

[10] From the Enrolled Bill Report at page 2: "Proponents argue that courts are reluctant to enforce existing law allowing a consumer to assert the defense of lack of licensure because it is within the Contractors State License Law, and they are reluctant to enforce the law because *there is no standard or measure of reliance upon which the courts may look when verifying licensure*." (Italics added.)

ameliorate the previously absolute requirement for a certificate by adding an "if controverted" clause to what was still at the time an absolute requirement for a certificate under subdivision (c). The License Board readily acknowledged that too many *licensed* contractors had already lost their cases because they couldn't obtain a verified certificate in time.[11] What's more, AB 2413 resurrected the doctrine of substantial compliance at least under certain limited circumstances not at issue in the case before us.[12]

But there were still two major changes to be made before the verified certificate subdivision reached today's version: In 1993, Assembly Bill No. 628 (AB 628) clarified that contractors *still* had the burden of proving licensure and there was no need for persons they were suing for compensation to produce the verified certificate. (See Stats 1993, ch. 797, § 1, p. 4358.)[13] And finally, in 2001, the verified certificate subdivision, formerly subdivision (c), was renumbered as subdivision (d) to make room for a new subdivision (b) that allows for disgorgement suits by persons who have already paid an unlicensed contractor. (See Stats. 2001, ch. 226, § 1, p. 2094; see also *White v. Cridlebaugh* (2009) 178 Cal.App.4th 506, 518-520 [explaining the Legislature wanted to

---

[11] The *Buzgheia* opinion helpfully provides a readily accessible swatch of the legislative history of AB 2413 taken from a May 1992 report of the Assembly Committee on Consumer Protection, Government Efficiency, and Economic Development (the Assembly Consumer Protection Committee):
    "While attorneys who represent contractors are aware they must plead licensure, many are not aware that a certificate from the board is necessary to prove it. [¶] The sponsor thinks that production of the certificate of licensure should only be required *if licensure is at issue in the case*. That is, if the contractor swears under oath that he or she was licensed, and the defendant's attorney has determined that the contractor was not, only then would the contractor be required to produce a copy of the certificate of licensure. . . . *The board may take up to 6 months to issue the certificate*. The sponsor states that *cases involving licensure status are rare*, and contractors are losing cases [e.g., by nonsuit] where they might otherwise prevail *but for this technicality*." (Assem. Com. Consumer Protection, Gov. Efficiency and Economic Dev., Analysis of Assem. Bill No. 2413 (1991-1992 Reg. Sess.) May 6, 1992.)" (*Buzgheia, supra*, 60 Cal.App.4th at p. 391, italics added.)

[12] AB 2413 added language to subdivision (d) (quoted above) that allowed for an evidentiary hearing to allow for substantial performance in certain cases. (See Stats. 1992, ch. 229, § 1, p. 1019.) The new language would later be explained in *MW Erectors, supra*, 36 Cal.4th at pages 431-434. Suffice to say that while substantial compliance returned to section 7031 in a limited way, it was is no longer the "'loophole'" it had been prior to 1989. (See *id*. at p. 430.)

[13] We repeat those two sentences from the statute; both have remained unchanged since 1993: "Nothing in this subdivision shall require any person or entity controverting licensure or proper licensure to produce a verified certificate. When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee."

13

give persons who deal with unlicensed contractors a "sword" in addition to the "shield" they already had].)

Neither of the two main California Supreme Court cases explicating section 7031 over the last 25 years, *Hydrotech, supra,* 52 Cal.3d 988 and *MW Erectors, supra*, 36 Cal.4th 412, have had occasion to confront the verified certificate provision in what is now subdivision (d). *Hydrotech* was decided in the wake of the 1989 anti-substantial compliance amendment, and decided that an unlicensed contractor could not even sue for *fraud* as a way around the plain terms of section 7031, subdivision (a). The *Hydrotech* court noted the policy against any "compensation for unlicensed contract work" was intended to outweigh "'any harshness between the parties,'" so even a party who *falsely* promises to pay an unlicensed contractor cannot be liable to that contractor. (*Hydrotech, supra*, 52 Cal.3d at p. 995, original italics omitted.) Along the way – as befits a case decided in the aftermath of the 1989 amendments to section 7031 – *Hydrotech* made it clear that substantial compliance was outside the pale of section 7031. (See *Hydrotech, supra,* at pp. 995-996.)

Like *Hydrotech*, *MW Erectors* was focused on subdivision (a) of section 7031, which has always been the core of section 7031. Subdivision (a) has always provided that a contractor must be licensed at all times during performance, and *MW Erectors* is a set of variations on that theme. There, a steel contractor *wasn't* licensed at the time the contract was made, or when performance was begun, but did obtain a license about two weeks after performance began and *most* of its performance occurred while it was licensed. (See *MW Erectors, supra*, 36 Cal.4th at p. 420.) The intermediate appellate court read subdivision (a) to allow the steel contractor to recover for work done *after* it had obtained a license, but the Supreme Court concluded the actual language of subdivision (a) requires licensing at all times during performance and the Legislature did not intend to allow any recovery without licensure at all times during performance. (*Id*. at pp. 424-430.)

14

There were no judicial admissions in the *MW Erectors* case for the court to confront. There *was* a judicial estoppel argument, based on the idea that in related litigation against the owner of the project, a specialty metal contractor had "implicitly" represented to the owner (and the owner's general contractor) that MW was fully licensed, and was thus able to obtain a settlement from the owner for amounts which necessarily were attributable to MW's work. MW claimed the specialty metal contractor was thus estopped to assert nonlicensure in a case where MW was suing it. (*MW Erectors, supra*, 36 Cal.4th at pp. 421-422.)

The *MW Erectors* court noted that neither the cross-complaint filed by the specialty metal contractor against the owner and its general contractor, nor its mechanic's lien, contained any mention of the steel contractor's work. However, in any event, said the high court, the steel contractor could not "invoke judicial estoppel for the simplest of reasons," namely, subdivision (a) expressly precludes any action in law *or equity*. (*MW Erectors, supra*, 36 Cal.4th at p. 423.) In that regard, the *MW Erectors* court quoted *Hydrotech* for the proposition that the "bar of section 7031(a) applies '[r]egardless of the equities.'" (*MW Erectors, supra*, 36 Cal.4th at p. 423, quoting *Hydrotech, supra*, 52 Cal.2d at p. 997.) Thus the *MW Erectors* court concluded, citing subdivision (a), that acceptance of MW's judicial estoppel argument would mean that MW could "recover compensation for work that required a license, even if [MW] was not licensed 'at all times' during the performance of that work. (§ 7031(a).)" (*MW Erectors, supra*, 36 Cal.4th at p. 423.)

However, after emphasizing that subdivision (a) would be applied regardless of its harsh consequences and even if it means one party obtains an unjust windfall (*MW Erectors, supra*, 36 Cal.4th at p. 424), the court ended its judicial estoppel discussion with a passage that took a somewhat wider-angle view of the judicial estoppel

15

issue. We quote the entirety of the passage in the margin,[14] but two aspects of it stand out. One is the qualification that "Nothing we say here is intended to authorize or condone abusive manipulation of the courts" – and we emphasize the words "abusive manipulation." The other is that such abuse can be avoided by normal discovery and investigation – in that case, by the owner and its general contractor. (See *ibid*.) We note, however, that the *MW Erectors* court stopped short of saying discovery and investigation were the *exclusive* means by which the abusive manipulation of the courts can be prevented.

## B. *Application*

In our case, counsel for Aztec was effectively trapped in a room with several doors, all locked from the outside, and in her opposition to the JNOV motion she tugged at all of them. And we conclude the trial judge had no choice but to keep them all locked – save one.

That one is the clear statement in Womack's complaint admitting Aztec was licensed, and even going so far as to sue Aztec's *license* bonding company under section 7071.6. *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264 (*Valerio*) demonstrates there are times it is error for a trial court to ignore the impact of an admission made in a party's pleadings, and we conclude this case was one of those times. In *Valerio*, the trial court erred in not giving effect to plaintiff's admission it had signed a written contract. To the same effect is *Thurman v. Bayshore*

---

14    This is the passage:
"Of course, the equitable doctrine of judicial estoppel targets not only unfairness between individual parties, but also abuse of the judicial system itself. *Nothing we say here is intended to authorize or condone abusive manipulation of the courts*. And the law provides means of avoiding such abuse, if any occurred, *under the circumstances alleged here*. Disney and Turner [the owner and its general contractor] could have determined through normal discovery and investigation whether Niederhauser's [the specialty metal contractor] cross-complaint and mechanic's lien included amounts attributable to the work of an unlicensed subcontractor. *For all that appears*, the two cross-defendants did precisely that before deciding to settle with Niederhauser. On the other hand, if persuaded that they had no legal obligation to pay such amounts, they were free to assert the matter as an affirmative defense to Niederhauser's claims." (*MW Erectors, supra*, 36 Cal.4th at p. 424, fn. omitted, italics added.)

*Transit Management, Inc.* (2012) 203 Cal.App.4th 1112 (*Thurman*) where it was held the trial court erred in not giving credence to admissions in an employee's complaints that the employer had, indeed, been providing meal periods from a certain date.

Womack's complaint effectively told both the court and Aztec – twice – that the issue of Aztec's licensure was not controverted for purposes of section 7031, subdivision (d). Under the doctrine of judicial admission, that removed the issue from the set of controverted issues. And if the issue of licensure was not controverted, then, under the plain language of section 7031, subdivision (d), there was no need on Aztec's part to present a verified certificate from the License Board as part of its case.

Womack makes two arguments against application of the doctrine of judicial admission here: his complaint was unverified and he denied Aztec's licensure allegation in his general denial to Aztec's cross-complaint. Under the circumstances of this case, though, Womack's plain admissions in his original complaint override these two arguments.

First, even unverified complaints can contain judicial admissions, as shown in *Reichert, supra,* 68 Cal.2d 822. There, the plaintiff in an insurance bad faith case admitted in his initial, *unverified*, pleading that he had filed for bankruptcy prior to filing his complaint. In later pleadings, however, he conveniently omitted mention of the bankruptcy. It didn't work. Because he had made no attempt to show his admission of the bankruptcy was the product of some sort of mistake or inadvertence, he was stuck with the admission. (*Id*. at p. 837.)

*Reichert* is particularly applicable to the case before us because it shows that a litigant cannot hide behind the lack of verification where the litigant sought to obtain some *advantage* from the original, but unverified, admission. In *Reichert*, the plaintiff admitted his bankruptcy in his original complaint hoping to finesse that fact by a spin on causation: As Justice Peters noted in his dissent, the plaintiff alleged the bankruptcy was merely part of a causal chain leading to his damages so as to prevent his

17

causes of action from vesting in the trustee in bankruptcy. (See *Reichert, supra*, 68 Cal.2d at p. 839, fn. 1 (dis. opn. of Peters, J.) While the majority rejected that point on the merits, it is significant that no one questioned the propriety of treating the original complaint's admission of bankruptcy as an admission. (*Id.* at pp. 839-841.)

Here, as in *Reichert*, Womack had a tactical reason to include the admission of Aztec's licensure in his original complaint. He wanted to assure recovery against Aztec's contractor's bond under section 7071.5,[15] and yet to seek such assurance meant admitting Aztec was licensed. We are not impressed by his attempt to gain a benefit by alleging licensure until his settlement with Aztec's bond company, then asserting non-licensure in order to scuttle his liability to Aztec.

The second argument – the actual denial in the answer to Aztec's cross-complaint – fails because of the sham pleading doctrine. Under the sham pleading doctrine, a pleader cannot circumvent prior admissions by the easy device of amending a pleading *without explanation*. (See *Wennerholm v. Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 716; *Hardy v. Admiral Oil Co.* (1961) 56 Cal.2d 836, 840-841; *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1189, fn. 1; *Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 344; *Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 751 ["The purpose of the doctrine is to enable the courts to prevent an abuse of process."]; *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 426 [noting sham pleading doctrine is not intended to prevent honest corrections of error but is to prevent abuse of process].) Significantly, the sham pleading rule encompasses prior pleadings even when made on information and belief. (See *Hendy v. Losse* (1991) 54 Cal.3d 723, 742-743 (*Hendy*).

We think this case cries out for application of the sham pleading doctrine – all the more so since this case does not seem to involve an honest, above-board

_____

[15] The statute allows for various parties injured by a licensed contractor to recover from a surety that has issued a bond to the contractor.

18

amendment of a prior statement in a complaint, but the semi-surreptitious withdrawal of that prior statement via a general denial in a cross-complaint. When Womack made his JNOV motion, he offered no factual basis to suggest his prior, unambiguous allegation that Aztec was licensed was somehow incorrect, or the product of mistake or inadvertence, or that he had somehow discovered new evidence showing the original allegation to have been incorrect. And, as we have pointed out above, the original admission carried solid indicia Womack meant it – not only because he listed a bond number that could only have been issued if Aztec was licensed, but because he had something to gain by the allegation. Trying to obtain the benefit of an easy general denial of a statement in a cross-complaint after one *already* obtained the benefit of affirming that statement in a complaint seems to us precisely the type of manipulative abuse the *MW Erectors* case decried.

Finally, all doubt as to the application of the sham pleading doctrine in this case is removed by Womack's failure to comply with the local rule requiring specification of all "controverted issues." Recall that the *MW Erectors* court pointed out that abusive manipulation of the courts could be curtailed by normal discovery and investigation. Well, one of the purposes of Orange County local rule 317 is to do just that – prevent ambushes like the one that took place here – by flushing out all controverted issues *prior* to trial.[16] Orange County Superior Court local rule 317 follows the salutary practice employed by most federal courts of requiring parties in civil cases to

[16]      Here is the applicable language from Orange County Superior Court local rule 317:
"An issue conference is required in all cases at least 10 days prior to the date set for trial, at which time the *parties are to meet and confer and execute necessary documents as listed below. Plaintiff or petitioner must arrange the issue conference* at a mutually agreeable time and location.
"At the issue conference *the parties* must:
" . . . .
"B. *Stipulate to all facts amenable to stipulation*.
"[¶] . . . [¶]
"E. *Prepare a Joint List of Controverted Issues*. If all the parties fail to agree that an issue is uncontroverted, then the issue is controverted."
"[¶] . . . [¶]
"The *Plaintiff or Petitioner is responsible for providing* courtesy copies of the Joint Statement of the Case, the Joint Witness List, and the Joint List of Controverted issues." (Italics added.)

19

meet and confer prior to a trial and *identify* what is, and what is not, controverted. The language of the rule does not allow for silent gamesmanship. Both parties have the duty to stipulate to what can be readily stipulated to, and identify what is to be controverted for the trial. By the time trial began, Womack was still prosecuting his complaint. The onus was thus on *him*, as plaintiff, to prepare the paperwork that stipulated to all facts "amenable to stipulation" and provide a "list" of identified issues, not just a coy "everything else is controverted" statement. And yet he never took the opportunity to articulate his controversion of the licensure in the very forum where he actually had a pre-trial *duty* to do so.

## IV. CONCLUSION

We reverse and remand the judgment in favor of Womack and direct the trial court to enter judgment for Aztec on its cross-complaint against Womack. It is a different story for Caballero. He never admitted that Aztec was licensed, or sued Aztec's license bond insurer. He was not the plaintiff required to facilitate an honest identification of controverted issues. Accordingly we affirm the defense judgment in his favor.

As to appellate costs, we direct the trial court on remand to ascertain that portion of the appellate costs of Aztec attributable to its appeal from the judgment in

20

favor of Womack, and assess all those costs against Womack.  As to that portion of appellate costs attributable to Aztec's appeal from the judgment in favor of Caballero, those costs are to be borne by each side, Aztec and Caballero.


BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.